In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-3071 & 03-3191

JEFF DUPUY, BELINDA DUPUY,
PILAR BERMAN, et al.,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*

BRYAN SAMUELS, Director,
Illinois Department of Children
and Family Services,

*Defendant-Appellee,*
*Cross-Appellant.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4199—**Rebecca R. Pallmeyer**, *Judge.*

———————

ARGUED JUNE 3, 2004—DECIDED FEBRUARY 3, 2005

———————

Before BAUER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Jeff Dupuy, Belinda Dupuy and
Pilar Berman brought this action under 42 U.S.C. § 1983 on
behalf of a class of persons who had been indicated as
perpetrators of child abuse or neglect in reports maintained
on the State Central Register of the Illinois Department of
Children and Family Services ("DCFS"). The plaintiffs
sought injunctive relief, alleging that the DCFS procedures
for investigating and disclosing allegations of child abuse

and neglect deprive them of due process of law. The district court granted the plaintiffs injunctive relief, and both parties have appealed. For the reasons set forth in the following opinion, we affirm in part and reverse in part and remand the cases for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A. DCFS Policies and Procedures Prior to This Litigation

The Illinois Abused and Neglected Child Reporting Act requires DCFS to "protect the health, safety and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect." 325 Ill. Comp. Stat. 5/2.[1] To achieve this mandate, DCFS operates a child abuse and neglect hotline, conducts investigations into allegations of child abuse and neglect, records and discloses (in limited circumstances) the findings of its investigations and provides a system to appeal those findings. DCFS also licenses child care facilities, such as day care centers and foster homes, and conducts background checks of current and prospective employees of DCFS-licensed child care facilities.

---

[1] The district court's opinion contains an exhaustive review of the DCFS procedures for investigating and reporting allegations of child abuse and neglect and provides detailed examples of how those procedures affected individual plaintiffs. *See Dupuy v. McDonald*, 141 F. Supp. 2d 1090, 1092-1131 (N.D. Ill. 2001). This opinion sets forth the factual findings of the district court relevant on appeal.

**1. The Investigative Process**

DCFS operates a toll-free, 24-hour hotline to receive reports of alleged child abuse or neglect. R.468-1, Joint Ex.1 at § 300.30. It receives over 350,000 calls annually, of which approximately one-third are formally investigated. DCFS rules require investigative staff to have in-person contact with the alleged victim, the alleged perpetrator and the child's caretaker within seven days after a report is received. *Id*. at § 300.90. DCFS formally investigates reports that it deems to have been made in good faith and that meet the following minimum criteria: (1) the alleged victim is less than eighteen years of age; (2) the child either has been harmed or is in substantial risk of harm; (3) the suspected perpetrator is an immediate family member, a person responsible for the child's care or a person who resides in the same house as the child; and (4) there was an abusive or neglectful incident or set of circumstances that caused the harm or substantial risk of harm. *Id*. at § 300.100(g).

At the start of a formal investigation, if the subject of a report is employed in or otherwise has a position that allows access to children, DCFS notifies the employer of the investigation. *Id.* at § 300.100(i). While the investigation is pending, the employer must take reasonable action to restrict the employee from contact with children at work. 325 Ill. Comp. Stat. 10/4.3.

Upon completion of the investigation, the DCFS investigator must decide whether credible evidence of child abuse or neglect exists. R.468-1, Joint Ex.1 at § 300.110(i)(1). DCFS rules define "credible evidence" to mean that "the available facts when viewed in light of surrounding circumstances would cause a reasonable person to believe that a child was abused or neglected." *Id*. at § 300.20. When credible evidence supports an allegation of child abuse or

neglect, DCFS designates the report as "indicated." *Id*. at § 300.110(i)(3).

### 2. Disclosure of Indicated Reports

DCFS maintains indicated reports on the State Central Register ("central register"). 325 Ill. Comp. Stat. 5/7.12. Indicated reports are retained on the central register for a minimum of five years. *Id*. at 5/7.14. Each abuse and neglect allegation is assigned to one of three retention categories: allegations of death of a child and/or sexual penetration are retained for fifty years; allegations involving serious physical injury, sexual molestation or sexual exploitation of a child are retained for twenty years; and all other allegations are retained for five years. 89 Ill. Admin. Code § 431.30. After the expiration of the retention period, the indicated report must be expunged, unless another report is received involving the same child, his sibling or offspring, or a child in the care of the persons responsible for the child's welfare. 325 Ill. Comp. Stat. 5/7.14.

For allegations concerning a person in a position with access to children, DCFS notifies the employer whether the report was indicated. R.468-1, Joint Ex.1 at § 300.130(d). Furthermore, in order for a person to obtain or renew a license, or to work with children in a licensed facility, DCFS first conducts a background check. This background check includes a check of the central register to determine whether the person has an indicated report against them. R.468-1, Joint Ex.4 at §§ 385.10(a), 385.30(d). An indicated report is placed on the central register and disclosed to current and potential employers even before any formal appeal or review process. As will be discussed later in this opinion,

the district court's preliminary injunction order, the subject of this appeal, modified this procedure. Notably, moreover, DCFS presumes that a person indicated for certain serious allegations is not suitable for a position that allows access to children.[2] *Id.* at § 385.50(a). The employer (but not the indicated person) may request DCFS review and waiver of the presumption of unsuitability. *Id*. at § 385.50(b). A child care facility must notify DCFS in writing of its decision regarding the employment of a person who has been indicated for child abuse or neglect. *Id*. at § 385.50(c).

### 3.  Appeals Process

Any indicated person may appeal and seek to have an indicated finding expunged. R.468-1, Joint Ex.2 at § 336.30. The appeal request must be made to DCFS in writing within sixty days of the date that DCFS sends the person notice that a report was indicated against him. *Id*. at § 336.80. The

---

[2] Severe allegations include: death, head injuries, internal injuries, wounds (gunshot, knife or puncture), torture, sexually transmitted diseases, sexual penetration, sexual molestation, sexual exploitation, failure to thrive, malnutrition, medical neglect of a disabled infant, and serious injury to the child. R.468-1, Joint Ex.4 at § 385.50(a). DCFS also presumes unsuitability to work with children for any person named in more than one indicated report for the following allegations: burns; poison; bone fractures; cuts, bruises, welts, abrasions and oral injuries; human bites; sprains or dislocations; tying or close confinement; substance misuse; mental and emotional impairment; substantial risk of physical injury or an environment injurious to health and welfare; substantial risk of sexual injury; inadequate supervision; abandonment/desertion; medical neglect; lock-out; inadequate food, shelter or clothing; and environmental neglect. *Id*.

appeals process has two steps: a child protection internal review and a full administrative hearing. *Id.* The internal reviewers consider the material in the appellant's investigative file and the appellant's brief written statement, and decide whether the record should be amended, expunged or removed.[3] *Id*.

If the appellant challenges the internal review decision, the Administrative Hearing Unit ("AHU") must schedule a hearing for a date within thirty days of the request.[4] *Id*. at § 336.110(d). In all hearings since March 1, 1996, DCFS has been required to prove the child abuse and neglect allegations by a preponderance of the evidence. *Id*. After the evidentiary hearing, the Administrative Law Judge ("ALJ") provides a recommended decision to the DCFS Director, who accepts, rejects or modifies the ALJ's decision and issues a final decision. *Id*. at § 336.150(a).

---

[3] As we shall discuss later in this opinion, DCFS amended the rules governing the appeals process after the hearing on the plaintiffs' preliminary injunction motion. The district court observed that the new regulations appeared to eliminate the internal review procedures, but that it could not be certain because DCFS had not provided the new procedures or rules implementing the new regulations. *Dupuy*, 141 F. Supp. 2d at 1100.

[4] As will be discussed later in this opinion, the district court found a history of inexcusably long delays in the appeals process. The district court's preliminary injunction order modifies DCFS procedures on appeal.

**B.  District Court Proceedings**

**1.  The District Court's Original Order**

The plaintiffs filed a motion for a preliminary injunction against several DCFS policies and procedures that they alleged deprived them of due process of law.[5] The plaintiffs challenged three core DCFS policies: (1) the indicated report decision-making process; (2) the notice and hearing policies; and (3) the disclosure and use of indicated report policies. The plaintiffs also challenged, among other things, DCFS' special policy of placing holds on the additional placement of foster children in a foster home that is reported for child abuse or neglect. The district court concluded that the procedure did not deprive foster parents of due process of law. *Dupuy v. McDonald*, 141 F. Supp. 2d 1090, 1140 (N.D. Ill. 2001). On appeal, the plaintiffs continue to assert that foster parents must be afforded an opportunity to contest foster care holds. We shall address this issue later in this opinion. Specifically, the plaintiffs challenged the "credible evidence" standard for indicating reports of child abuse or neglect. They argued that DCFS investigators understood the standard to mean that "any" credible evidence of abuse or neglect was sufficient and, as a result, gathered only inculpatory evidence and disregarded any evidence that the abuse or neglect did not occur. *Id*. at 1135. Further, the plaintiffs contended that DCFS provided no meaningful opportunity to contest an indicated finding.

---

[5] The district court construed the plaintiffs' motion to seek preliminary relief only for "child care employees," such as day care providers, foster care givers and social workers, as opposed to family members who are indicated by DCFS. *Dupuy*, 141 F. Supp. 2d at 1131.

And they maintained that indicated reports should not be disclosed to and used by employers.

The district court concluded that the then-employed DCFS procedures violated the plaintiffs' due process rights. As a threshold matter, the district court determined that "the pursuit of work in one's chosen profession constitutes a recognized and protected liberty interest . . . ." *Id*. at 1134. The district court found that the plaintiffs "were deprived of such an interest" because, "[w]hether it be by way of their enforcement of mandatory background checks on prospective employees or 'Notices of Presumptive Unsuitability' sent to current employers, DCFS policies and procedures clearly effectuate an indicated perpetrator's exclusion from the child care profession." *Id*.

The district court then assessed what process the Constitution required by applying the three-factor test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The court found that the plaintiffs have a serious and legitimate private interest in pursuing employment in the child care field, and that the State has an equal countervailing interest in protecting children. *Dupuy*, 141 F. Supp. 2d at 1136. Accordingly, the district court focused on the risk of error inherent in the then-employed credible evidence standard. *Id*. (citing *Valmonte v. Bane*, 18 F.3d 992, 1002-04 (2d Cir. 1994)). The court found that the record supported the argument that the standard often was interpreted by DCFS investigators as "any" credible evidence. *Id*. at 1135. Further, the record supported that some investigators gathered and considered only inculpatory evidence and disregarded any evidence weighing against an indicated finding. *Id*. The court also cited "unrebutted evidence that 74.6% of indicated findings that are challenged are ultimately reversed on review." *Id*. at 1137. The court con-

cluded that "this staggering expungement rate is due to the relatively low standard of proof required to indicate a finding, combined with the indefensible delays that allow memories to fade and, therefore, evidence to become unreliable." *Id*.

The district court then addressed DCFS' notice and hearing policies. The court expressed grave concern "about the inexcusable delays experienced by Plaintiffs in attempting to appeal, and seek expungement of, the indicated findings against them." *Id*. at 1138. The court found:

> At the time of the preliminary injunction hearing, DCFS regulations stated that an administrative hearing would be provided within thirty days of a request. Ill. Admin. Code tit. 89, § 335.110(d)(1). The AHU, however, routinely sent appellants a letter informing them that while DCFS had received their hearing request, it could not schedule a hearing promptly due to a backlog.

*Id*. The court cited specific examples of plaintiffs who had experienced delays from over a year to as long as three years. *Id*. at 1138-39.

The district court noted that, after the preliminary injunction hearing, DCFS had codified new regulations that changed the timetable for the DCFS appeals process. *Id*. (citing 89 Ill. Admin. Code §§ 336 et seq. ("Amended Rule 336")). Specifically, Amended Rule 336 provides that a person who appeals an indicated finding is entitled to an administrative hearing and final decision within ninety days. 89 Ill. Admin. Code § 336.220. The district court explained the import of the amended regulation in the preliminary injunction context:

> [I]f followed, Amended Rule 336 will ensure that an

individual is afforded a hearing, under a "preponderance of the evidence" standard, within 90 days of his or her request for appeal. Again, the court notes that, in theory, this is a marked improvement, but without evidence that any such improvement has yet occurred, the court must grant Plaintiffs' request for a preliminary injunction.

*Dupuy*, 141 F. Supp. 2d at 1139.

Instead of directing specific relief, the district court gave the parties sixty days to develop constitutionally adequate procedures.

### 2.   Specific Injunctive Relief Ordered by the District Court

The parties subsequently negotiated changes to DCFS policies and procedures during seven court-mediated sessions. R.361 at 1-2. At about this time, DCFS drafted new procedures to govern the indicated report decision-making process. The new draft procedures instruct investigators how to assess the credibility and relevancy of the information they gather during the investigation of suspected child abuse. R.443 at 6 (citing R.323, Draft Procedure 300.60k). More importantly, the new draft procedures also state clearly that a child abuse or neglect investigation must consider *all* evidence that an incident of abuse or neglect did *or* did not occur. R.323, Draft Procedure 300.60*l*.[6]

---

[6]  The draft procedures underscore the requirement to consider all evidence:

> The final step in determining whether [State Central Register] reports will be indicated or unfounded is to consider *all*
>
> (continued...)

The district court entered an order on July 10, 2003, to resolve the parties' remaining disputes and to order specific relief. With respect to the burden of proof for indicating reports, the court reviewed DCFS' new draft procedures and stated that they are "clearly appropriate steps." R.443 at 6. The district court directed DCFS to "adopt and maintain a standard that entails consideration of all available evidence, both inculpatory and exculpatory, for its child abuse and neglect investigations." *Id*. at 7. The plaintiffs urged nonetheless that the court should enjoin DCFS from any use of the term "credible evidence" in the regulations. *Id*. at 6-7. The district court noted that DCFS may be well-advised to use a new expression for the burden of proof, but the court chose not to interfere with the state agency's operations more than it deemed necessary to remedy the constitutional violation. *Id*. at 7.

---

[6] (...continued)

> *information* obtained during the investigation and determine which information is relevant to be used as evidence to make a determination. It is of critical importance that all evidence suggesting that an incident of abuse or neglect *did not occur* be given the same consideration as evidence suggesting that an incident of abuse or neglect did occur. The CANTS XXXX, Child Abuse/Neglect Finding Matrix, must be used to evaluate each piece of information to determine its relevance, credibility and weight of importance in proving or disproving the allegations presented. The supervisor is to review the matrix with the investigator to determine whether the evidence is **sufficient to lead a reasonable person to believe** that the incident occurred or that the set of circumstances is or was present. *Equal consideration shall be given to information entered in both columns*.

R.323, Draft Procedure § 300.60*l* (emphasis in original).

Further, the district court addressed the plaintiffs' right to reply to allegations of child abuse or neglect against them. The court ruled that it was constitutionally untenable for indicated reports to be recorded on the central register and disclosed to employers before any formal appeal or review process. The district court directed that DCFS shall provide a limited telephonic administrative review prior to the entry of an indicated finding for any child care worker.[7] *Id*. at 11. The district court "believe[d] that it is at least probable that the conferences will in fact eliminate some of the gross errors described in the court's earlier opinions." *Id*. at 12. Both sides reserved objections to the procedure.

The district court added several requirements to ensure that the conference is effective: (1) prior to the conference, the child care worker receives a worksheet describing all bases for the potential indicated finding; (2) a DCFS manager or supervisor who had no part in the child abuse or neglect investigation presides over the conference; (3) the conference may be rescheduled at least once for good cause; (4) one hour should be allotted for each conference; (5) the worker is not permitted to call or cross-examine witnesses; (6) the worker may be represented by counsel and may present his own account of the incident and submit evidence; (7) the DCFS manager or supervisor who conducts the conference will have the authority to enter or overturn the investigator's recommendation or to return it for further investigation; and (8) the worker will receive prompt notice of the final determination. *Id*. at 11-12, 14.

The district court also contemplated more rapid post-

---

[7] The district court referred to this review as an "Administrator's conference." R.443 at 11.

deprivation hearings for child care workers. DCFS proposed a forty-five day time frame, and the plaintiffs proposed twenty-one days; the district court believed that "the swiftest reasonable process will consume five full weeks."[8] *Id*. The court therefore directed that DCFS shall provide child care workers, upon timely request for an appeal, a hearing and final decision within thirty-five days.

Another significant aspect of the district court proceedings was DCFS' objection to any injunctive relief for school teachers and administrators, applicants for child care positions or child care licenses, child care workers at non-DCFS-licensed facilities and persons pursuing a career in child care. The district court first responded that any school teacher or school administrator who is not by law entitled to a pre-termination hearing stands to be deprived of the right to continue in his profession as the result of an indicated finding. Similarly, the court noted that workers in non-DCFS-licensed facilities can suffer significant disruption and loss as a result of an indicated finding that is later reversed.

---

[8] The district court explained that

> [t]his time frame assumes approximately seven days for the Department to set a hearing date and provide a copy of the investigative file to the appellant; another seven days for the appellant to prepare for a pre-hearing conference at which subpoenas will issue; at least seven more days before an approximately two-day hearing will take place; seven more calendar days (that is, no fewer than five working days) for the Administrative Law Judge to issue a recommended decision, and finally, another seven days for review of the ALJ's decision by the Director's office.

*Id*. at 15.

For those reasons, the court believed that such persons are entitled to a pre-deprivation administrative conference and an expedited appeals process. *Id*. at 4-5.

However, the district court did not believe that license applicants, students and others pursuing a career in child care were entitled to the pre-deprivation conference or to expedited appeals. *Id*. at 2. The court took the view that such individuals "have expectations, but not existing interests, in working as child care professionals." *Id*. at 4. Such individuals, it therefore concluded, would not be harmed by waiting ninety days for administrative review. The district court noted the counterbalancing burden on DCFS of determining which individuals are pursuing a career in child care and the possibility that making the new procedures widely available would diminish their effectiveness. *Id.* at 4-5.

The district court then turned to foster parents. The district court held that foster parents are protected adequately by the DCFS licensing procedures, and that they have no liberty interest in a foster care license that demands a pre-deprivation conference or an expedited appeal. *Id.* at 5. The court rejected the plaintiffs' argument that the loss of foster care payments, which results from allegations of child abuse or neglect, is equal in effect to a child care worker's losing his job due to an indicated finding. *Id*. The district court reasoned that DCFS' payments to foster parents are not intended as income; rather, foster care regulations both permit foster parents to work outside the home and require them to have sufficient financial resources to provide for the foster child. *Id*. Further, the foster care payments simply are reimbursement for caring for the foster child—removing the child relieves foster parents from providing that service and meeting that expense. *Id.*

## C. Contentions of the Parties

Neither party is satisfied completely with the district court's remedy. The plaintiffs contend that the standard for indicating reports remains too low and that the district court should have enjoined the use of the term "credible evidence." The plaintiffs further maintain that only a full evidentiary hearing before a report is indicated and disclosed will protect their rights. The plaintiffs also urge that any person—not only child care workers—who may be indicated by DCFS should be afforded pre-deprivation process.

DCFS, in contrast, submits that the more rigorous interpretation of the credible evidence standard, combined with an administrative conference for child care workers before a report is indicated, provides sufficient pre-deprivation process. Moreover, DCFS notes that indicated persons have the right to prompt, full post-deprivation administrative review. DCFS also argues that the district court abused its discretion by requiring DCFS to provide child care workers with expedited appeals within thirty-five days.

## II

## DISCUSSION

### A.  Standard of Review

A district court's decision to grant or deny an injunction is entitled to deference by the reviewing courts, and we shall reverse only for an abuse of discretion. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). We review the district court's findings of fact for clear error and its conclusions of law de novo. *Id.*

### B.  Due Process Clause

The Due Process Clause of the Fourteenth Amendment forbids a state to deprive any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To maintain [a due process] action, a plaintiff must establish that a state actor has deprived him of a constitutionally protected liberty or property interest without due process of law." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002). Accordingly, our due process inquiry involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

#### 1.  Liberty Interest

The plaintiffs allege that the DCFS procedures deprived them of their liberty interest to pursue the occupation of their choice, child care. As our court has estab-

lished previously:

> It is well-settled that an individual has no cognizable liberty interest in his reputation; consequently, when a state actor makes allegations that merely damage a person's reputation, no federally protected liberty interest has been implicated. *See Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002). Indeed, "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment." *Hojnacki*, 285 F.3d at 548 (internal quotations and citations omitted). Rather, it is only the "alteration of legal status," such as governmental deprivation of a right previously held, "which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Paul*, 424 U.S. at 708-09; *Townsend v. Vallas*, 256 F.3d 661, 669 (7th Cir. 2001). As such, when a state actor casts doubt on an individual's "good name, reputation, honor or integrity" in such a manner that it becomes "virtually impossible for the [individual] to find new employment in his chosen field," the government has infringed upon that individual's liberty interest to pursue the occupation of his choice." *Townsend*, 256 F.3d at 670.

*Doyle*, 305 F.3d at 617 (parallel citations omitted).

The district court concluded that child care workers effectively are barred from future employment in the child care field once an indicated finding of child abuse or neglect against them is disclosed to, and used by, licensing agencies and present or prospective employers. *Dupuy*, 141 F. Supp. 2d at 1139. Such circumstances squarely implicate a protected liberty interest. *See Doyle*, 305 F.3d at

617 (deciding that DCFS employees named in indicated reports had alleged sufficiently a deprivation of their liberty interests); *Valmonte*, 18 F.3d at 1001 (being indicated for child abuse or neglect in a report maintained on the state central register did not simply defame child care worker but placed a tangible burden on her employment prospects); *Cavarretta v. Dep't of Children & Family Servs.*, 660 N.E.2d 250, 258 (Ill. App. Ct. 1996) (being named in indicated report for child abuse or neglect maintained on the central register implicated the plaintiff's liberty interest in pursuing his chosen occupation).[9]

### 2. Pre-deprivation Process

We must now examine whether the procedural safeguards established by DCFS are insufficient to protect that interest. "Due Process 'is not a technical conception with a fixed content unrelated to time, place[,] and circumstances[;]' instead, it 'is flexible and calls for such procedural protections as the particular situation demands.'" *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (quoting *Mathews*, 424 U.S. at 334) (alterations in original). What process the Constitution requires is dictated by the familiar *Mathews* three-factor test. That approach requires that we

---

[9] *See also Pleva v. Norquist*, 195 F.3d 905, 915 (7th Cir. 1999) ("When the government removes someone from a position 'for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of dishonesty or other job-related moral turpitude,' the consequences are akin to depriving him of the ability to follow his chosen trade, and due process must be provided.") (quoting *Lawson v. Sheriff of Tippecanoe County, Indiana*, 725 F.2d 1136, 1138 (7th Cir. 1984)).

balance: " 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.' " *Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (quoting *Mathews*, 424 U.S. at 335); *see also Hudson*, 374 F.3d at 559-60. As we have stated in the analogous context of a public employee's termination:

> As long as substantial post-deprivation process is available, the pre-deprivation process required when terminating an employee often need not be elaborate or extensive. Rather, in many situations, it "should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action[;] . . . [the] pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story."

*Hudson*, 374 F.3d at 560 (quoting *Gilbert,* 520 U.S. at 929) (internal citations and quotations omitted in original). We therefore turn to an evaluation of the pre-deprivation process afforded to child care workers by the credible evidence standard of proof for indicating and disclosing reports of child abuse or neglect and the limited Administrator's conference available before DCFS finalizes a decision to indicate a report.

### a. credible evidence standard

As discussed earlier, DCFS rules define credible evidence of child abuse or neglect to mean that "the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Admin. Code § 336.20. The district court found that DCFS investigators historically read this standard to permit them to indicate a finding on no more than "any" credible evidence. Many investigators therefore did not consider evidence that the child abuse or neglect did not occur. *Dupuy*, 141 F. Supp. 2d at 1135. Consistent with the district court's order, DCFS has drafted a new rule that, among other things, expressly instructs the factfinder to consider all available evidence that an incident of abuse or neglect did or did not occur and admonishes that "[i]t is of critical importance that all evidence suggesting that an incident of abuse or neglect *did not occur* be given the same consideration as evidence suggesting that an incident of abuse or neglect did occur." R.323, Draft Procedure § 300.60*l* (emphasis in original).

The plaintiffs nevertheless submit that, even though DCFS investigators now must consider exculpatory evidence, the standard of proof for indicating reports is not sufficiently high. In essence, they submit that the "credible evidence" standard will continue to enable DCFS to indicate a finding based on a scintilla of inculpatory evidence, even in the face of equal or more powerful exculpatory evidence. In their view, we ought to require either a clear and convincing standard or, at minimum, a preponderance of the evidence standard. The plaintiffs contend that, despite DCFS' efforts, the standard has not changed substantively as a practical matter because DCFS investigators have long understood the credible evidence standard to impose no ob-

ligation upon them to consider or weigh exculpatory evidence. Therefore, investigators will continue to indicate individuals if there is any evidence to support an abuse or neglect allegation, even in the face of significant evidence to the contrary.

DCFS maintains that the district court did not abuse its discretion by concluding that the more rigorous credible evidence standard together with the pre-deprivation Administrator's conference will ensure the accuracy of indicated reports. Moreover, DCFS notes that indicated persons also can seek to expunge an indicated report through a full evidentiary hearing after the indication is placed on the register.

Both sides present strong cases on the need for an accurate evaluation of the facts even at this initial stage. The child care workers want to avoid being stigmatized by a false indicated report that will preclude them from working in the child care field until it is expunged. *See, e.g.*, *Doyle*, 305 F.3d at 619 (noting that, based on "thin evidence, and prior to an adversarial hearing that may develop a more complete and balanced record, DCFS discloses this finding to current and prospective employers of the indicated individual"). On the other side of the balance, "[a]ssuring the safety and well-being of a child exposed to abuse or neglect often requires DCFS to act promptly on the basis of meager evidence." *Id.*

Given the importance of the interests of both parties, the decisive factor in this case is the high risk of erroneous deprivation, *see Valmonte*, 18 F.3d at 1003; specifically, the unacceptable 74.6 percent reversal rate for challenged indicated reports under DCFS' original method of evaluating these claims. The standard of proof that applies no doubt will influence directly the risk of erroneous judgments: a higher standard reduces the risk of indicating an

innocent person but also increases the risk of not indicating a perpetrator of child abuse or neglect. *See In re Winship*, 397 U.S. 358, 370-71 (1970) (Harlan, J., concurring). Moreover, a higher standard of proof often will impede quick action by the State, although this concern is somewhat balanced by the State's shared interest in avoiding mistakes and identifying the true perpetrator. *See Dupuy*, 141 F. Supp. 2d at 1139; *Lyon v. Dep't of Children & Family Servs.*, 807 N.E.2d 423, 436 (Ill. 2004).

We believe that the more rigorous interpretation of the "credible evidence" standard required by the district court's order is an appropriate measure at the pre-indication stage. As understood by the district court, this standard requires that the investigator not simply identify some evidence that supports an indicated finding. It also requires that the investigator take into account *all* of the available evidence that tends to show that abuse or neglect did *or* did not occur. Only then may the investigator decide whether that totality of evidence would cause a reasonable individual to believe that a child was abused or neglected.

The plaintiffs nevertheless submit that the requirement that the investigator identify and weigh all the available evidence on both sides of the issue likely will be ignored as a practical matter. They point out that the same formulation was employed prior to this litigation and, at that time, widely was understood to describe the investigator's obligation as simply to identify *any* evidence of abuse or neglect—without the concomitant obligation to identify and weigh evidence pointing against such a finding.

Our colleague in the district court indicated a certain unease with the continuation of a term of art that for so long was identified with a one-sided view of the evidence that no party defends today. Other than bureaucratic intransigence,

it is difficult to identify any reason for DCFS' determination not to abandon this term. Several considerations convince us, however, that, at this preliminary stage of the litigation, the district court did not abuse its discretion in deciding not to require the wholesale abandonment of the term. First of all, as the district court noted, the term now is employed in a regulatory context that contains clear instructions on proper investigative techniques and that explicitly requires that the investigating officer consider all evidence on both sides of the issue.[10] We also believe that, absent more concrete evidence that the standard would be mis-

---

[10] The district court found:

> New draft DCFS procedures provide explicit, comprehensive instructions for assessing the reliability of information uncovered in the investigation, including the significance of professional training; independent verification of non-professional sources of information; sensitivity to the interest a witness might have, and the consistency and plausibility of the witness's statement; consideration of the witness's opportunity to observe; and recognition of the age, developmental stage, and susceptibility to influence any child witness. (Draft Procedures, § 300.60K, Exhibit 3 to Plaintiff's Statement.) Most important, the new procedures state clearly that a child abuse or neglect investigation requires consideration of "[a]ll evidence that indicates that an incident of abuse or neglect **did or did not occur**." (*Id.* § 300.60L, emphasis in original.) The procedures underscore still further the requirement that exculpatory evidence be considered, directing the investigator to create a matrix having two columns, one for recording evidence suggesting that abuse or neglect did not occur and a second for recording evidence in support of a finding of abuse or neglect.

R.443 at 6.

applied in the future, the district court was correct in determining that it was appropriate for the federal district court to refrain from interfering with the State's administration of a state program any more than was necessary to remedy the constitutional violation. *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 392 (1992). Moreover, although the fears of the plaintiffs at this point are speculative, if retention of the "credible evidence" standard later becomes problematic in practice, the plaintiffs are not without recourse. At that point, faced with direct evidence of an unconstitutional course of conduct, the district court would be on solid ground in requiring abolition of the term.

In evaluating this standard for the pre-indication stage of the investigation, the articulation of this standard of proof by DCFS certainly ought not be assessed in isolation. Rather, it is important to take into consideration that, before a person can be indicated under this standard of proof, the investigator's determination to that effect is subject to review by an examiner who did not take part in the investigation. This review must include a hearing at which the accused individual will have a right to present his side of the story. When viewed in this procedural context, we cannot say that the district court abused its discretion when it permitted DCFS to retain the term "credible evidence" in its articulation of the governing standard of proof.[11]

---

[11] At first glance, it may appear that our determination as to the "credible evidence" standard sets our circuit's law at odds with the standard articulated by the Court of Appeals for the Second Circuit in *Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994). Our study of that case leads us to the conclusion that no such conflict is present. In that case, our colleagues on that bench simply did

(continued...)

### b. administrator's conference

In approving the district court's decision on the appropriate standard of proof, we relied in part on the fact that an accused individual would be afforded an opportunity to be heard prior to the decision to indicate that individual. Because our analysis of the burden of proof therefore relies in part on this hearing and because the plaintiffs have questioned, as an independent issue, the adequacy of that hearing, we now turn to an examination of that step in the process.

The district court's injunction requires DCFS to provide child care workers (upon request) an opportunity to respond to the allegations before DCFS indicates and discloses a report. The hallmark of due process is an opportunity to be heard at a meaningful time and in a meaningful manner. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). "[T]he formality and procedural requisites for the [pre-termination] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. . . . In

---

[11] (...continued)

not have before them the context present in our case. The initial investigation took place under a "some credible evidence" standard that did not require the investigator to consider evidence on both sides of the question. The investigator's decision was not subject to pre-indication review by an officer who had not participated in the investigation, nor was the accused individual afforded an opportunity to state his side of the story prior to indication. Post-indication review, moreover, was, at least at the early stages, subject to a deferential standard. Given this overall lack of procedural protection, the Second Circuit required that the initial determination be by a "fair preponderance of the evidence." *Id*. at 1003-05.

general, something less than a full evidentiary hearing
is sufficient prior to adverse administrative action." *Id*.
at 545 (internal citations and quotations omitted).

The plaintiffs contend that the Administrator's conference
does not provide the minimal process due because it is not
an evidentiary hearing that affords, for example, the right to
cross-examine witnesses. DCFS maintains, however, that the
State's interest in protecting children and the need for
prompt action outweigh the interest of child care workers in
maintaining employment in the time between a report's
indication and full administrative review. DCFS further
submits that the conference fulfills the limited purpose of a
pre-deprivation hearing because it provides oral or written
notice of the charges, an explanation of the evidence on
which the proposed action is based and an opportunity for
the child care worker to present his side of the story.
Moreover, DCFS notes that its amended regulations provide
for post-deprivation administrative review (at most within
ninety days after a timely request for appeal), at which it
must prove its case by a preponderance of the evidence. *See*
89 Ill. Admin. Code § 336.120(b)(15).

The plaintiffs respond that, in the usual case, such as the
one presented by *Loudermill*, informal pre-deprivation
process is sufficient because there is a prompt post-depriva-
tion evidentiary hearing and the State can compensate fully
the wrongfully discharged employee through reinstatement
and back pay. In their view, the situation presented here is
substantially different. DCFS, they point out, does not
employ the child care workers, and therefore it cannot order
reinstatement or back pay to compensate a wrongly indi-
cated child care worker. DCFS, in reply, submits that the
adequacy of a pre-determination hearing does not depend

on whether the employer is the Government. It relies on *FDIC v. Mallen*, 486 U.S. 230 (1988), in which the Supreme Court rejected a bank employee's due process challenge against the FDIC, even though the FDIC was not his employer and could not provide him with back pay. Appellee's Br. at 40.

In assessing the need for a full evidentiary hearing at the pre-deprivation stage, we employ once again the familiar *Mathews* three-factor balancing test. The child care workers have an interest in not being stigmatized and in not losing their job due to a mistaken interim decision. On the other hand, DCFS needs to respond quickly to allegations of child abuse or neglect.

In order to assess these submissions, we think it best to examine the entire process encompassed within the Administrator's conference. At the outset, it is important to note that the accused individual is provided with adequate notice of the opportunity for such a hearing and with sufficient information about the nature of the allegation to afford an adequate opportunity to tell his side of the story. The accused individual is provided with the name of the child involved in the alleged incident, the place of the alleged incident, an explanation of the central register and the length of time the incident will remain on the central register. Furthermore, the accused individual is informed of the opportunity for a post-indication hearing. Before the conference, the accused worker also is provided with an explanation of the basis for the investigator's belief that the allegation has merit. The accused is permitted to retain counsel to evaluate the evidence and to represent the accused at both the pre- and post-indication hearings.

We think that it is also important to stress that the decision-maker at the Administrator's conference is a person

who has had no part in the investigative process. Therefore, the accused, while not having the opportunity to call other witnesses and to engage in cross-examination, does have the opportunity to tell his side of the story and to present evidence that he deems relevant before a new decision-maker.

The plaintiffs correctly note that the accused individual before an Administrator's conference is not in exactly the same position as the municipal employee faced with discharge in *Loudermill*. In the usual *Loudermill* situation, an erroneous decision by the employer is subject to later remedies that can compensate for the loss of employment during the period between the preliminary hearing and the later plenary examination of the case. Because DCFS does not employ the accused worker in the situation before us, no such remedy is easily available. Nevertheless, we believe that the procedure contemplated by the district court's order, especially when combined with the other procedural safeguards, provides the accused with an adequate opportunity to avoid an unjust determination. At the Administrator's conference stage, the accused has adequate notice of the allegation and an opportunity to place his version of the situation before an individual who has played no adversarial role in the matter. Furthermore, any adverse determination is subject to de novo review under a heightened standard of proof within a very short period of time. Given the countervailing concerns of DCFS to identify individuals who pose a continuing threat to children, we believe that the structure approved by the district court's order is adequate to ensure the accused individual due process.

### 3. Post-deprivation Process

We now turn to procedures for the period after a report is indicated and placed on the central register. The district court ordered DCFS to adopt a thirty-five day expedited appeals process for child care workers. The Supreme Court has explained:

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*Mallen*, 486 U.S. at 242.

Under the Supreme Court's three-factor balancing test, child care workers have an interest in quickly returning to work, and DCFS has an interest in avoiding hasty, inaccurate decisions. The district court found that DCFS' stunning 74.6 percent reversal rate after appeal was due not only to the low evidentiary standard but also to "inexcusably long delays, which allow memories to fade." *Dupuy*, 141 F. Supp. 2d at 1136; *see also Doyle*, 305 F.3d at 618-20 (concluding that the credible evidence standard, operating in conjunction with a belated post-deprivation process, failed to afford child care employees adequate process). Notably, before the district court, DCFS proposed a forty-five day administrative appeals process and the plaintiffs proposed twenty-one days. R.363-1. The district court carefully evaluated the tasks that each side would have to accomplish in preparing for the hearing and determined that a thirty-five day period was the appropriate interim. We can find no basis in this record to alter that conclusion.

**C. Persons Entitled to the Administrator's Conference**

We next turn to the district court's holding that the Administrator's conference was not constitutionally required for license applicants, students and others pursuing a career in child care who are indicated by DCFS because "[s]uch individuals have expectations, but not existing interests, in working as child care professionals." R.443 at 4.

### 1. Liberty Interest

It is well-settled that, standing alone, damage to one's reputation does not implicate a cognizable liberty interest. *Paul v. Davis*, 424 U.S. 693, 711-12 (1976). In the employment context, in which most of these cases arise, we have set forth the following elements of the cause of action. A claim that a government employer has infringed an employee's liberty to pursue his occupation requires: (1) he was stigmatized by the employer's actions; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure. *McMath v. City of Gary, Indiana*, 976 F.2d 1026, 1031 (7th Cir. 1992). Although our case is not an employment case, this approach nevertheless is helpful.

The first element is not in dispute: Labeling a person as a child abuser certainly calls into question his "good name, reputation, honor, or integrity." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)); *see also Valmonte*, 18 F.3d at 1000.

With regard to the second element, in *Koch v. Stanard*, 962 F.2d 605, 607 (7th Cir. 1992), we held that police force applicants were not deprived of a liberty interest because the defendants had not published the results of the

applicants' psychological tests. *See also Medley v. City of Milwaukee*, 969 F.2d 312, 318 (7th Cir. 1992) (holding that landlords had no liberty interest in continued participation in State rent assistance program, in part because they did not allege that the defendants had disclosed the reason for the disbarment to anyone but the landlords or to other public housing agencies).

In the present case, DCFS contends that an indicated report does not violate any liberty interest of a career entrant because, at the time DCFS decides to indicate a report, it does not disclose that report to any potential future employer. Appellee's Br. at 45. The plaintiffs, in contrast, submit that the necessary disclosure does occur because, by operation of statute, DCFS discloses indicated reports to employers whenever an applicant looks for work in the child care field. Appellant's Reply Br. at 24. In *Valmonte*, the Second Circuit held that being listed on the state child abuse register stigmatized the plaintiff who said she would be applying for a child care position because her status would be disclosed to her potential employers when they consulted the register, as required by state law. *Valmonte*, 18 F.3d at 1000. Persons pursuing a career in child care in Illinois face a similar situation because *as a condition of employment*, "all current and prospective employees of a child care facility who have any possible contact with children in the course of their duties," must authorize DCFS to conduct a background check to determine if the person has an indicated report against him. 225 Ill. Comp. Stat. 10/4.3. Because a prospective employee's status is disseminated to his potential employer, by operation of state law, during the hiring process, we believe that the plaintiffs have met the publication requirement.

With respect to the third element, whether there has

been a tangible loss of other government opportunities, DCFS contends that a defamatory statement that affects only future employment and is not incident to the loss of current employment does not implicate a protected liberty interest. Appellee's Br. at 44. Accordingly, DCFS continues, a person who does not occupy a current position in the child care field does not warrant the opportunity to be heard before DCFS indicates the report. *Id.*

In our attempt to adhere faithfully to the holdings of *Paul* and *Siegert v. Gilley*, 500 U.S. 226 (1991), we have said that

> mere defamation by the government does not deprive a person of "liberty" protected by the Fourteenth Amendment, even when it causes "serious impairment of [one's] future employment," *Siegert v. Gilley*, 500 U.S. 226, 234 (1991); *see Paul,* 424 U.S. at 697. Rather it is the "alteration of legal status," that, "combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Paul*, 424 U.S. at 708-09, 710.

*Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (parallel citations omitted); *see also McMath*, 976 F.2d at 1032 (holding that plaintiffs had stated a claim for a liberty interest because "there is a nexus between the *firing*—the loss of current employment—and the publication sufficient to implicate a liberty interest cognizable under *Siegert* and prior case law") (emphasis in original); *Koch,* 962 F.2d at 607 (Flaum, J., concurring) ("*Siegert* is consistent with prior case law providing that a public official's publication of a defamatory statement may infringe an individual's liberty interest if the statement (1) stigmatizes the individual in a manner that substantially forecloses opportunities for future

government employment, and (2) is made incident to an adverse current employment decision.").

As our colleagues in the Second Circuit recognized in *Valmonte*, the case before us presents a situation that is significantly different from the usual situation in which we are asked to determine whether the plaintiff can be said to suffer the deprivation of a liberty interest as opposed to a simple state tort injury for defamation. As in the case before us, *Valmonte* dealt directly with whether a person who stated that she would be applying for a child care position, but had not been terminated from government employment, could establish the sort of tangible loss required to be deprived of a constitutional interest. *Valmonte*, 18 F.3d at 1000. The judges of the Second Circuit, acknowledging explicitly the restrictions imposed by *Siegert* and *Paul,* determined that the case involved unique circumstances: A child care employer was required *by statute* to check the state child abuse register before hiring a new employee; the employer had to justify in writing its decision to hire a person listed on the register; and the employer had to inform an applicant if he was not hired because of being listed on the register. *Id*. at 1001. The court concluded that "the fact that the defamation occurs precisely in conjunction with an individual's attempt to attain employment within the child care field, and is coupled with a statutory impediment mandating that employers justify hiring the individual, is enough to compel a finding that there is a liberty interest implicated." *Id.*

Today, we are confronted with circumstances very similar to those before the Second Circuit in *Valmonte*. Illinois law requires prospective employers to consult the central register before hiring an individual and to notify DCFS in writing of its decision to hire a person who has been

indicated as a perpetrator of child abuse or neglect. 89 Ill. Admin. Code § 385.50(c). In short, placement of an individual's name on the central register does more than create a reputational injury. It places, by operation of law, a significant, indeed almost insuperable, impediment on obtaining a position in the entire field of child care. Along with our colleagues in the Second Circuit, we believe that the imposition of this added legal impediment constitutes a very tangible loss of employment opportunities due to the disclosure of the indicated report.

In *Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978), a case decided before *Siegert*, our court held that the plaintiff who had been rated ineligible for federal employment for as long as three years, on the ground of alleged alcoholism and abusive behavior, had a liberty interest. The Civil Service Commission's findings were available to any federal agency for various purposes, such that the plaintiff effectively was deprived of the opportunity to work in any capacity for the federal government. We held that the plaintiff had a protected liberty interest because "in addition to the infliction of a stigma, [he] suffered a tangible loss in being foreclosed from any consideration for government employment for a substantial time." *Id*.

### 2.  Pre-deprivation Process

DCFS submits that career entrants do not have a strong interest in an opportunity to be heard before DCFS indicates a report. In its view, because DCFS notifies a licensed child care facility only of indicated reports that involve current or prospective employees, the entrant has no need for an immediate review of the decision to place his name on the central register. We evaluate what process is due to the

career entrants through balancing the three *Mathews* factors: the private interest; the risk of an erroneous deprivation of that interest and the probable value of additional procedural safeguards; and the State's interests. *Gilbert*, 520 U.S. at 931-32.

We cannot accept DCFS' characterization of the need of career entrants. As we have noted already, dissemination to prospective employers is the conduct that triggers the career entrants' liberty interest. And, as we also have noted previously, the plaintiffs' ability to avoid erroneous indicated reports and to obtain employment in their chosen field is a substantial interest. *See, e.g., Doyle*, 305 F.3d at 619 (noting that, based on "thin evidence, and prior to an adversarial hearing that may develop a more complete and balanced record, DCFS discloses this finding to current and prospective employers of the indicated individual"). For the entrant pursuing immediate job opportunities, for the student enrolled in an educational program, especially one involving placement in internships or involving other similar contact with children, the need for immediate resolution of the matter might well be of extreme importance.

DCFS maintains that providing the Administrator's conference to all indicated persons would place a substantial burden on its limited resources. Given the extremely high error rate experienced by DCFS in its initial decisions to subject an individual to indication, we cannot accept the conclusory statement that the process of correcting such errors before they ruin a career is overly burdensome. DCFS would have to make a significantly more specific showing that affording a person a limited opportunity to respond to the allegations against him would impose significant administrative burdens, excessive costs or an intolerable

delay in responding to reports of child abuse. The require-
ments of the Administrator's conference are not elaborate.
Furthermore, DCFS shares the accused person's interest in
avoiding erroneous decisions: If the wrong person is
indicated, then the actual perpetrator remains unidentified
and, if DCFS mistakenly indicates a report, it will waste re-
sources defending the report in a full evidentiary hearing on
administrative appeal.

With regard to the risk of erroneous deprivation and the
value of added procedures, the district court's conclu-
sion that a pre-deprivation conference effectively will
reduce the incidence of erroneous indicated reports
applies with equal force to the situation of career entrants.
For these reasons, we believe that providing career entrants
the Administrator's conference best accommodates these
competing interests, and we direct the district court to
impose an appropriate remedial order.[12]

### D.  Foster Parents

An indicated report against a foster parent can have

---

[12] We leave it to the district court, in fashioning a remedy, to
delineate with more precision exactly who ought to qualify as
a "career entrant." Certainly, persons actively engaged in the
job placement process and persons enrolled in academic pro-
grams aimed specifically at a profession dealing with an aspect
of child care suffer the sort of harm described in the text. On the
other hand, those with more remote aspirations will not be able
to assert that the impediment imposed by the State through an
indicated report is as immediate. With the assistance of the
parties, the district court will be able to fashion an order that
protects those against whom the State's action will have immedi-
ate and significant repercussions.

significant and immediate ramifications. In most cases, it causes the removal of the child. *Dupuy*, 141 F. Supp. 2d at 1130. A pending or indicated report also is a ground for DCFS to deny an application for a foster home license or to stop the placement of additional children in a foster home. *Id*. DCFS pays foster care benefits on behalf of each child placed in a foster home who is a DCFS ward. *Id*. at 1129. Although the benefits are intended to support the child, foster parents are allowed to use the benefits to pay common household expenses, such as mortgage payments and utilities. *Id*. Foster parents commonly come to depend on those benefits for household expenses, and thus, the removal of a foster child or a hold on the placement of additional children in a home can have a significant financial impact. *Id*. at 1129-30. When DCFS places a hold on additional placements of children to a foster home, it sends written notice; however, the hold is not appealable and is not lifted until the conditions that led to the hold no longer exist.

The plaintiffs rightfully concede that foster parents do not have a constitutionally protected interest in maintaining a relationship with a specific foster child. Appellant's Reply Br. at 24; *see Procopio v. Johnson*, 994 F.2d 325, 330 (7th Cir. 1993) (Illinois law confers no liberty interest on foster parents to a relationship with a foster child or the continued placement of certain children in their home, because the foster family relationship is subject to the State's determination that it should continue); *see also Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845-46 (1977) (foster parents' interest in the family relationship "derives from a knowingly assumed contractual relation with the State," and therefore, "it is appropriate to ascertain from state law the expectations and entitlements of the parties"). In this appeal, however, the plaintiffs claim a protected

liberty interest in pursuing a career in foster care and a property interest in the foster care benefits that DCFS pays foster homes on behalf of each child under their care.

### 1. Liberty Interest

The plaintiffs claim that foster care holds effectively deprive them of their right to be employed as foster parents. As we have noted earlier in this opinion, to establish a protected liberty interest, the plaintiffs must show a loss of reputation *plus* the deprivation of some other legal status or right. *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (only the " 'alteration of legal status,' " such as loss of a right previously held, when combined with the damage to reputation, requires due process) (quoting *Paul*, 424 U.S. at 708-09).

#### a. stigma

As we said previously in this opinion, labeling someone as a child abuser calls into question that person's "good name, reputation, honor, or integrity." *Roth*, 408 U.S. at 573; *see also Valmonte*, 18 F.3d at 1000. However, only defamatory statements that are disclosed or made public can stigmatize a person. *Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000). Illinois law generally requires that the information on the central register remain confidential. 325 Ill. Comp. Stat. 5/11. Although limited exceptions are enumerated in the statute, the plaintiffs have not alleged that those exceptions apply to foster parents. *Cf. Doyle*, 305 F.3d at 617 (*child care workers* had a protected liberty interest because prospective employers check the central register to determine if the employee has been indicated for abuse or neglect). *But see Bohn v. County of*

*Dakota*, 772 F.2d 1433, 1436 n.4 (8th Cir. 1985) (determining that biological parents identified as child abusers had a liberty interest because, by defaming them, investigating the quality of their family life and maintaining data on them, the State exposed them to public opprobrium and may have damaged their standing in the community); *Yuan v. Rivera*, No. 96 Civ. 6628, 1998 WL 63404, at *5 (S.D.N.Y. Feb. 17, 1998) (stating that "[t]he severe reputational harm of being labeled a child abuser coupled with the potential for dissemination may be all that is needed to establish stigma") (citing *Bohn*, 772 F.2d at 1436 n.4; *Lee TT. v. Dowling*, 664 N.E.2d 1243 (N.Y. 1996)).

### b.  alteration in legal status

The plaintiffs contend that foster parenting is a career, the pursuit of which is a liberty interest. They reason that the State requires foster parents to have sufficient financial resources and permits them to hold outside employment only if it does not interfere with the proper care of the foster child. *See* Appellant's Br. at 36-37; *see also Doyle*, 305 F.3d at 617 ("[W]hen a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field,' the government has infringed upon that individual's liberty interest to pursue the occupation of his choice.") (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)).

DCFS submits that foster care is not a career, but a contractual role created by the State for the purpose of assisting the unfortunate victims of child abuse or neglect. Appellee's Br. at 50. Moreover, DCFS continues, the payments to foster parents do not amount to "income" but merely reimburse the parents for expenses incurred in caring for the child. *Id.* When a child is removed, the payments stop but so do the expenses incurred in caring for that child. *Id*. *But see Lee TT.*, 664 N.E.2d at 1250 (holding that foster parents satisfied "plus" requirement because as a result of their listing on the state child abuse registry, the foster children were removed, they lost benefits available to them as foster parents, and they lost statutory preference for adoption).

On the record before us, we believe that DCFS' characterization of the situation is the accurate one. In analyzing a foster family's liberty interest, the Supreme Court has recognized that "the typical foster-care contract gives the

agency the right to recall the child 'upon request,' and . . . the discretionary authority vested in the agency 'is on its face incompatible with plaintiffs' claim of legal entitlement.'" *Smith*, 431 U.S. at 860 (Stewart, J., concurring) (quoting *Org. of Foster Families v. Dumpson*, 418 F. Supp. 277, 281 (D.C.N.Y. 1976)). We believe that, although foster parents play an honorable and, indeed, noble, role in our society, that role cannot be said to constitute, at least for purposes of due process analysis, a "career."

### 2.  Property Interest

The plaintiffs also claim that foster parents have a property interest in the benefits that DCFS makes on behalf of children placed in their care. DCFS responds that foster parents have no legitimate entitlement to the foster care benefits paid by DCFS on behalf of foster children in their care. "The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). "Once that characteristic is found, the types of interests protected as 'property' are varied and, as often as not, intangible, relating to the whole domain of social and economic fact." *Id*. (internal quotations and citations omitted). DCFS argues that even though foster parents often come to depend on foster care benefits for common living expenses, they have no legitimate entitlement to the payments under state law. Appellee's Br. at 49.

In *Youakim v. McDonald*, 71 F.3d 1274 (7th Cir. 1995), we set forth the general principle that

> before an individual will be deemed to have a property interest in a benefit, he must show "more than an abstract need or desire for it. . . . He must, instead,

[establish] a *legitimate claim of entitlement to it*." (Emphasis added). Such a legitimate claim of entitlement, moreover, is "defined by existing rules or understandings that stem from an independent source such as state law."

*Id*. at 1288 (quoting *Roth*, 408 U.S. at 577) (alterations in original). In *Youakim*, we held that DCFS violated the due process rights of foster children by discontinuing their benefits because they lived with relatives that could no longer be licensed after legislative reform unless DCFS provided the home an opportunity to become licensed. *Id*. at 1292. Contrary to the plaintiffs' assertion, however, we have never held that foster parents have a property interest in the foster care benefits paid on behalf of the children under their care. We agree that, under the present circumstances, the property interests asserted by the plaintiffs are not of the kind protected by the Fourteenth Amendment.

## Conclusion

Accordingly, we affirm in part and reverse and remand in part the judgment of the district court. Each party shall bear its own costs in this court.

AFFIRMED in part,
REVERSED and REMANDED in part

A true Copy:

      Teste:

                                 _____

                                 *Clerk of the United States Court of*
                                     *Appeals for the Seventh Circuit*