Dennis A. TEAGUE, Plaintiff-Appellant,†

Linda COLVIN and Curtis Williams, Intervening Plaintiffs-Appellants,

v.

J. B. VAN HOLLEN, Walt Neverman, Dennis Fortunato and Brian O'Keefe, Defendants-Respondents.

Court of Appeals

*No. 2014AP2360. Oral argument November 18, 2015.—Decided February 11, 2016.*

2016 WI App 20

(Also reported in 877 N.W.2d 379.)

† Petition for Review filed.

548

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jeffrey R. Myer* and *Sheila Sullivan* of *Legal Action of Wisconsin*, Milwaukee. There was oral argument by *Jeffrey R. Myer*.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Anthony D. Russomanno*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was oral argument by *Anthony D. Russomanno*.

Before Higginbotham, Sherman, and Blanchard, JJ.

¶ 1. BLANCHARD, J. Dennis Teague[1] appeals a judgment of the circuit court dismissing his claims

---

[1] Dennis Teague was the only plaintiff when this case was filed. Later, Linda Colvin and Curtis Williams intervened. However, the primary focus of the parties both before the circuit court and now on appeal has been on facts involving Teague alone, not on any additional or different facts involving Colvin or Williams. Therefore, we address the arguments as if they involve Teague alone, but this decision addresses and resolves the claims of all three plaintiffs.

alleging statutory and constitutional violations by four Wisconsin officials ("the state officials"). The essence of Teague's claims is that the Wisconsin Department of Justice (DOJ) knowingly propagates inaccurate information about Teague each time it compiles and releases a report in response to a request from a member of the public for Wisconsin criminal history information that refers to Teague. Without declaratory, injunctive relief preventing that practice, Teague contends, DOJ will compile and release what amount to false positive criminal history reports on him.

¶ 2. The dispute centers around DOJ's use of a large criminal history database. Teague has obtained from DOJ a so-called "innocence letter," which in effect certifies that as of a particular day in 2009 Teague had no criminal convictions and that Teague should not be confused with another individual, ATP,[2] who has a criminal history. The potential for confusion arose because ATP has in the past given Teague's name to authorities as an alias, and this is a fact that is reflected in DOJ's database, as one reference contained in ATP's criminal history record. Teague seeks to prevent DOJ from responding to requests for criminal history referring to Teague with the ATP criminal history in which Teague's name appears as an alias, without any reference to the innocence letter that Teague previously obtained from DOJ. Teague contends that if DOJ provides that response, Teague's reputation and opportunities for employment, housing, and the like could be impaired, because such

---

[2] We identify ATP by his initials because he apparently has not had an opportunity to contest representations made about him by the parties in this case.

responses could be read to imply that Teague and ATP are the same individual, who has used both names and has a criminal history.

¶ 3. For reasons explained more fully below, we affirm the following circuit court decisions: to dismiss Teague's claim under the Wisconsin public records law; to dismiss Teague's request for an order, under the authority of Wis. Stat. § 19.70 (2013–14), requiring DOJ to in some manner correct or supplement the database; and to dismiss Teague's constitutional claims.

## BACKGROUND

¶ 4. The parties do not dispute pertinent facts. The following summary is largely based on facts found by the circuit court following a six-day trial to the court.

### DOJ Criminal History Database

¶ 5. DOJ maintains a criminal history database through its Crime Information Bureau. State statutes require DOJ to maintain the database and set the fees that DOJ may charge for the costs of providing reports in response to criminal history search requests from the public, although details regarding the statutes do not matter to any issue raised on appeal. *See* Wis. Stat. §§ 165.83–165.845, 165.82. What matters is that DOJ maintains the database and, by necessity, has established a system for compiling and releasing reports in response to search requests for criminal history referring to identified individuals.

¶ 6. The database pools arrest and conviction information provided by law enforcement agencies, the Wisconsin Department of Corrections, and the court

system. The database now contains approximately 1.3 million criminal history records based on 1.3 million sets of fingerprints. Each record contains a "master" name, which is the name contained in the first submission to DOJ about an individual as identified by fingerprints. Records often also contain additional names. Thus, each record is linked to one set of fingerprints, and incorporates the name or names, and the date or dates of birth, provided by the submitting agencies to DOJ, beginning with a master name. The database treats each name, other than the master name, as an alias name. For example, if the master name for a record is John Smith, even if it were determined at some later point that "Smith's" legal name is Joe Jones, Jones is treated as an alias and the master name continues to be Smith.

¶ 7. As common sense suggests would be the case, an individual may be associated in the database with multiple master or alias names or multiple birthdates or both, because individuals sometimes use various names or birthdates, have legal name changes, and typographical errors occur. Conversely, and again as one would expect, a given master or alias name may be associated with any number of individuals. This may happen because a name is common, has been fraudulently used, or because of typographical errors. And, as to birthdates, many people share the same or closely matching birthdates, false dates of birth may be given, and again there can be errors.

¶ 8. In sum, as counsel for the state officials explained at oral argument, DOJ treats names and birthdates in the database as "non-unique," because names and birthdates are changeable. In contrast, fingerprints, considered to be permanent and unique to individuals, are the foundation of the database, with

one set of fingerprints submitted in connection with criminal history defining each record.

*Name-Based Search Requests*

¶ 9. Members of the public may submit requests to DOJ for information from the database using such identifiers for the subject of the request as name and birthdate. Requests may be accompanied by the subject's fingerprints, but DOJ does not require fingerprints. Requests not accompanied by fingerprints are called "name-based" requests. This is the type of request at issue in this case.

¶ 10. When DOJ receives a name-based search request—*e.g.*, for criminal history referring to Dennis Antonio Teague, with a birthdate—DOJ searches the database for records that may be responsive, either because a record is an exact match or because there is an individual associated in the database with a combination of the first and last names and a date of birth matching or close to the queried date of birth. If the search does not find any matches or near-matches, DOJ's responsive report states that no record corresponds to the criteria submitted.

¶ 11. If the search produces a match or a near-match to a name contained in one or more records, DOJ responds with a report of the type at issue in this case. The report begins by displaying the information submitted by the requester, followed by explanatory material, portions of which we refer to below. The explanatory material is followed by the criminal record (*i.e.*, record of arrests or convictions of a person identified by fingerprints) that has been identified as a match or near-match, and includes a photograph of the person identified by fingerprints. In contrast, if the

search produces no matches or near-matches, DOJ responds with the statement, "No CRIMINAL HISTORY FOUND."

*"Innocence Letters"*

¶ 12. DOJ provides a process by which an individual can obtain what amounts to certification that the individual has no criminal history, at least as of the time of certification, when there is a potential for criminal history reports to suggest otherwise. The individual submits to DOJ a set of fingerprints and, if DOJ verifies that the submitted fingerprints do not match those linked to any record, DOJ sends the individual a notarized statement, sometimes called an "innocence letter." The innocence letter states that the individual has no criminal history as of that date, and that the individual should not be confused with another individual who has criminal history reflected on a record in the database. To clarify, when an individual submits fingerprints as part of this process, in order to be recognized as a unique individual, DOJ does not retain the submitted fingerprints. Only the fingerprints that are submitted by an agency in connection with an offense are linked to a record, as summarized above.

¶ 13. Teague submitted fingerprints as part of the DOJ innocence letter process and received such a letter in March 2009.

¶ 14. Individuals with innocence letters, such as Teague, are free to present the innocence letter to potential employers, landlords, or others who may be making or have made a criminal history check using identifiers of the individual. While DOJ keeps on file the innocence letters that it issues, under its current

practices DOJ does not reference the existence of the letters in the database or otherwise make use of the letters in responding to criminal history requests. As we now explain, the essence of Teague's claims is that DOJ does not, but should, take the substance of innocence letters into account in responding to name-based search requests.

## Teague's Claims

¶ 15. Teague's claims all arise from concern that, despite the fact that DOJ has memorialized Teague's lack of criminal history in an innocence letter, when a member of the public submits a name-based search request using Teague's name and birthdate, DOJ would release in response a report of the type described above that contains the criminal history record of ATP.[4] This report lists Teague's name as an alias for ATP's name, because as referenced above ATP has given Teague's name, together with a date matching his date of birth, to authorities as an alias.[5] Teague argues that DOJ is obligated to provide requesters

---

[4] We say "would release" because it is not clear to us what search requests have actually been submitted using Teague's name and birthdate and what records DOJ has in fact released in response any such request. However, neither side raises an issue on this topic, and therefore we accept the effective concession of the state officials that the record on appeal establishes that, under its practices at the time of the litigation before the circuit court, DOJ would have released a report containing the references that Teague now challenges in response to a name-based request using Teague's name and birthdate.

[5] Teague informs us that the search methodologies used by DOJ to keep and search its database produces a "match" between Teague's full name and birthdate and the alias information in the criminal history report of ATP despite the fact that Teague's date of birth does not match either of the two

with an explanation to avoid allowing requesters to falsely suspect that Teague might have the criminal history referred to in the report (here, the criminal history that in fact belongs to ATP). Teague argues that such reports are "false" and "highly defamatory," because recipients could interpret the DOJ report to mean that a person with no criminal history does have criminal history, and that in this case Teague and ATP are the same individual with the listed criminal history.

¶ 16. The operative complaint names as defendants state officials who include the director and deputy director of the Crime Information Bureau. Excluding the first claim, which Teague does not continue to pursue on appeal, the complaint alleges that the state officials: contrary to the Wisconsin public records law, chapter 19, subchapter II, WIS. STAT. §§ 19.31–19.39, fail to or incorrectly perform the balancing test for release of records before releasing criminal history referring to Teague; violate the former WIS. STAT. § 19.365 (now WIS. STAT. § 19.70) by failing "either to correct its records or allow the filing of a concise written statement each time defendants identify [ATP's] information" as being associated with Teague; violate Teague's federal and state constitutional rights to equal protection of the laws, and his rights to substantive due process and to procedural due process.

---

birthdates listed on the report, but is six days apart from one of them. However, as far as we can discern neither side presents us with a developed argument that merits delving into whatever the record may reveal regarding near-match issues, that is, regarding how DOJ identifies the particular records that DOJ deems responsive to requests.

¶ 17. The circuit court resolved opposing motions for summary judgment by dismissing both of Teague's statutory claims and the equal protection challenge. The court held a trial on the remaining constitutional claims, after which it entered findings of fact, conclusions of law, and a judgment dismissing the case.

## DISCUSSION

### I. PUBLIC RECORDS LAW

¶ 18. Regarding his only claim that relies on the public records law,[6] Teague argues that DOJ should be enjoined from releasing ATP's criminal history (with Teague's name listed as an alias) in response to name-based requests using Teague's name and birthdate. In particular, Teague seeks an order prohibiting DOJ from following its current report-releasing practices based on the balancing test established under a line of cases that includes *Woznicki v. Erickson*, 202 Wis. 2d 178, 549 N.W.2d 699 (1996). Under this authority, circuit courts in certain circumstances may prohibit authorities from releasing all or parts of public records if inspection "would result in harm to the public interest which outweighs the public interest in allowing inspection." *Id.* at 192.

¶ 19. We are persuaded by the following position that the state officials take in challenging the public records law claim. When it comes to challenges to

---

[6] While Wis. Stat. § 19.70 is in the same chapter as the public records law, it is outside the public records law. *Compare* chapter 19, subchapter II, Wis. Stat. §§ 19.31–19.39, *with* § 19.70. The state officials do not suggest that Wis. Stat. § 19.356 precludes Teague's § 19.70 claim, and they acknowledge that it does not preclude Teague's constitutional claims. We address the § 19.70 and constitutional claims separately below.

decisions by authorities under the public records law *to release* records, as opposed to decisions by authorities *to withhold* records, the legislature has precluded judicial review except in defined circumstances not presented here. We conclude that, in enacting Wis. Act 47 in 2003, in particular the provisions now found at WIS. STAT. § 19.356, the legislature decided to preclude judicial review of a public records law claim under these circumstances.

¶ 20. This presents a question of statutory interpretation, which we review without deference to the circuit court. *See Tammi v. Porsche Cars N. Am., Inc.,* 2009 WI 83, ¶ 25, 320 Wis. 2d 45, 768 N.W.2d 783.

A. *Woznicki* and Act 47—WIS. STAT. § 19.356

¶ 21. In *Woznicki,* a district attorney used subpoenas to obtain public employee personnel records and telephone records of the subject of a criminal investigation. *Woznicki,* 202 Wis. 2d at 181–82. The district attorney proposed to release these records in response to a public records request. *Id.* In pertinent part our supreme court held that because "reputational and privacy interests . . . are inherent in such records" and "special public policy reasons . . . are raised when a district attorney chooses to release materials gathered during the course of a criminal investigation," "the district attorney's decision to release these records is subject to de novo review by the circuit court." *Id.* at 181. In this review, the circuit court is to apply a "balancing test to determine whether permitting inspection would result in harm to the public interest which outweighs the legislative policy recognizing the public interest in allowing inspection." *Id.* at 183–84.

¶ 22. Three years later, in *Milwaukee Teachers' Education Association v. Milwaukee Board of School Directors*, 227 Wis. 2d 779, 596 N.W.2d 403 (1999), the supreme court broadened its holding in *Woznicki* in addressing a request for de novo circuit court review of the release, by a public school district, of records regarding discipline of district employees. Based in part on the conclusion in *Woznicki* that "[o]ur case law has consistently recognized a public policy interest in protecting the personal privacy and reputations of citizens," the court concluded that "the right of *de novo* judicial review provided by this court in *Woznicki* is available whether or not the custodian of the requested public records is a district attorney." *Milwaukee Teachers' Educ. Ass'n*, 227 Wis. 2d at 789, 799 (quoting *Woznicki*, 202 Wis. 2d at 187).

¶ 23. If the law had remained as it was following *Woznicki* and *Milwaukee Teachers'*, we would proceed to address Teague's argument that the public's strong interest in avoiding unfair uses of criminal history records outweighs the public's weak interest in record releases that Teague contends are not responsive to the records requests at issue. However, as this court has noted, the legislature reacted to these opinions by enacting 2003 Wis. Act 47, most pertinent here, WIS. STAT. § 19.356. *See Local 2489, AFSCME v. Rock Cty*, 2004 WI App 210, 277 Wis. 2d 208, 689 N.W.2d 644.

¶ 24. This court recently summarized the "general rule" created by WIS. STAT. § 19.356.[7] *Moustakis v.*

---

[7] WISCONSIN STATUTE § 19.356, entitled "Notice to record subject; right of action," provides as follows in pertinent part. As discussed in the text below, of particular interest is subsection (1).

> (1) Except as authorized in this section or as otherwise provided by statute, no authority is required to notify a record

subject prior to providing to a requester access to a record containing information pertaining to that record subject, and no person is entitled to judicial review of the decision of an authority to provide a requester with access to a record.

(2)(a) Except as provided in pars. (b) to (d) and as otherwise authorized or required by statute, if an authority decides under s. 19.35 to permit access to a record specified in this paragraph, the authority shall, before permitting access and within 3 days after making the decision to permit access, serve written notice of that decision on any record subject to whom the record pertains, either by certified mail or by personally serving the notice on the record subject. The notice shall briefly describe the requested record and include a description of the rights of the record subject under subs. (3) and (4). This paragraph applies only to the following records:

1. A record containing information relating to an employee that is created or kept by the authority and that is the result of an investigation into a disciplinary matter involving the employee or possible employment-related violation by the employee of a statute, ordinance, rule, regulation, or policy of the employee's employer.

2. A record obtained by the authority through a subpoena or search warrant.

3. A record prepared by an employer other than an authority, if that record contains information relating to an employee of that employer, unless the employee authorizes the authority to provide access to that information.

. . . .

(3) Within 5 days after receipt of a notice under sub. (2)(a), a record subject may provide written notification to the authority of his or her intent to seek a court order restraining the authority from providing access to the requested record.

(4) Within 10 days after receipt of a notice under sub. (2)(a), a record subject may commence an action seeking a court order to restrain the authority from providing access to the requested record. If a record subject commences such an action, the record subject shall name the authority as a defendant. Notwithstanding s. 803.09, the requester may intervene in the action as a matter of right. If the requester does not intervene in the action,

the authority shall notify the requester of the results of the proceedings under this subsection and sub. (5).

**(5)** An authority shall not provide access to a requested record within 12 days of sending a notice pertaining to that record under sub. (2)(a). In addition, if the record subject commences an action under sub. (4), the authority shall not provide access to the requested record during pendency of the action. If the record subject appeals or petitions for review of a decision of the court or the time for appeal or petition for review of a decision adverse to the record subject has not expired, the authority shall not provide access to the requested record until any appeal is decided, until the period for appealing or petitioning for review expires, until a petition for review is denied, or until the authority receives written notice from the record subject that an appeal or petition for review will not be filed, whichever occurs first.

**(6)** The court, in an action commenced under sub. (4), may restrain the authority from providing access to the requested record. The court shall apply substantive common law principles construing the right to inspect, copy, or receive copies of records in making its decision.

. . . .

**(9)**(a) Except as otherwise authorized or required by statute, if an authority decides under s. 19.35 to permit access to a record containing information relating to a record subject who is an officer or employee of the authority holding a local public office or a state public office, the authority shall, before permitting access and within 3 days after making the decision to permit access, serve written notice of that decision on the record subject, either by certified mail or by personally serving the notice on the record subject. The notice shall briefly describe the requested record and include a description of the rights of the record subject under par. (b).

(b) Within 5 days after receipt of a notice under par. (a), a record subject may augment the record to be released with written comments and documentation selected by the record subject. Except as otherwise authorized or required by statute, the authority under par. (a) shall release the record as augmented by the record subject.

Generally speaking, [public] record subjects are not entitled to notice that a record concerning them will be released, nor are they entitled "to judicial review of the decision of an authority to provide a requester with access to a record." WIS. STAT. § 19.356(1). However, the legislature has excluded three narrow categories of records from this general rule, which categories are defined by WIS. STAT. § 19.356(2)(a)(1–3).

*Id.*, ¶ 14.[8] The "three narrow categories of records" to which we referred in *Moustakis* are: identified types of disciplinary-related employment records; records obtained through subpoena or execution of a search warrant; and records prepared by non-authority employers. *See* § 19.356(2)(a).

B. Interpretation of WIS. STAT. § 19.356

¶ 25. Statutory interpretation " 'begins with the language of the statute.' " *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* We interpret the language of the statute "in the context in which it is used; not in isolation but as part of a whole; in relation

_____
[8] From the petition for review granted by our supreme court in *Moustakis v. State of Wisconsin Department of Justice*, 2015 WI App 63, 364 Wis. 2d 740, 869 N.W.2d 788, *review granted*, 2016 WI 2, 365 Wis. 2d 741, 872 N.W.2d 668, now pending in that court, it appears unlikely that the court will address the issue that we now resolve.

to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Id.*, ¶ 46. The "scope, context, and purpose" of a statute are relevant to a plain meaning interpretation as long as they are "ascertainable from the text and structure of the statute itself." *Id.*, ¶ 48. If the language of the statute is unambiguous, "there is no need to consult extrinsic sources of interpretation, such as legislative history." *Id.*, ¶ 46.

¶ 26. In addition, we bear in mind the interpretative presumption reflected in the declaration of policy contained in WIS. STAT. § 19.31: The public records law "shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied."

¶ 27. The state officials argue that, under a plain language interpretation of WIS. STAT. § 19.356, the legislature created three exclusive circumstances in which a court may entertain a challenge under the public records law to an authority's plan to release records, and there is no dispute that Teague's circumstances do not fit within any of the three alternatives. That is, under the State's argument, the legislature manifestly limited litigation options under the public records law that previously existed under the authority of such cases as *Woznicki*, and in doing so excluded the public records claim here. We have previously referred to the final phrase of § 19.356 as the "right-of-action provision," *see Local 2489*, 277 Wis. 2d 208, ¶ 3, and we continue that usage here.

¶ 28. We now explain why we agree with the state officials that the right-of-action provision bars Teague's public records claim, and then explain Teague's concessions and address his arguments.

¶ 29. To repeat, the key provision states as follows, with the right-of-action provision in italics:

> Except as authorized in this section or as otherwise provided by statute, no authority is required to notify a record subject prior to providing to a requester access to a record containing information pertaining to that record subject, and *no person is entitled to judicial review of the decision of an authority to provide a requester with access to a record.*

WIS. STAT. § 19.356(1) (emphasis added).

¶ 30. As pertinent here, when read in the context of WIS. STAT. § 19.356 as a whole, the right-of-action provision unambiguously bars any person from seeking judicial review of an authority's decision to release a record unless: (1) a provision within § 19.356 authorizes judicial review; or (2) a statute other than § 19.356 authorizes judicial review. Key terms used in § 19.356(1) are defined in the public records law: "Authority," is defined at WIS. STAT. § 19.32(1); "Record," at § 19.32(2); "Record subject," at § 19.32(2g); and "Requester," at § 19.32(3). None of these definitions appears to alter the pertinent meaning of § 19.356(1).

¶ 31. The meaning of the right-of-action provision within the statute as a whole is evident. The opening phrase of WIS. STAT. § 19.356(1), "[e]xcept as authorized by this section," refers to authorization that is conferred because the subject falls within an exception in § 19.356, notably one of the three categories of records: disciplinary-related employment records; records obtained by way of subpoena or search warrant;

and records prepared by non-authority employers. *See* § 19.356(2)(a). The notice requirement is explained more fully in subsecs. (2), (3), and (5), and the availability of limited judicial review, introduced in the right-of-action provision, is explained more fully in subsecs. (4)19.356(4), (6)19.356(6), and (7)19.356(7),.

¶ 32. For these reasons, we conclude that the terms of WIS. STAT. § 19.356(1) are unambiguous in precluding judicial review of Teague's public records law claim, and therefore we do not consult extrinsic sources of interpretation.

¶ 33. We turn now to Teague's concessions and arguments. Beginning with the first phrase in WIS. STAT. § 19.356(1), "[e]xcept as authorized in this section," Teague does not argue that the DOJ reports at issue here are disciplinary-related employment records, records obtained by way of subpoena or search warrant, or records prepared by non-authority employers. *See* § 19.356(2)(a). Regarding the next phrase, "or as otherwise provided by statute," Teague does not argue that his public records claims are "otherwise" authorized under any statute.

¶ 34. Teague makes one observation based on the reference to notice in WIS. STAT. § 19.356(1), but we fail to see how his observation undermines our interpretation of WIS. STAT. § 19.356. Teague observes that, barring any contrary statute apart from provisions within § 19.356, the same individuals who receive the benefit of the required notice also may seek judicial review. However, this observation does not advance Teague's argument. Absent a contrary statute, those who might challenge release of three defined types of records are entitled both to receive notice and to pursue judicial review, but Teague concedes that he does *not* belong to this group.

568

¶ 35. Teague argues that his statutory claims do not seek "judicial review," as that phrase is used in WIS. STAT. § 19.356(1). Teague's argument proceeds as follows. "Judicial review" is commonly used to refer to limited proceedings of circuit courts, such as judicial review of administrative decisions under WIS. STAT. ch. 227.53. Bearing in mind this common usage of "judicial review," Teague contends, the only "judicial review" referred to in the right-of-action provision is another, similarly limited proceeding, namely, an action that may be commenced under subsec. (4) of § 19.356. *See* § 19.356(4). Therefore, the meaning of the right-of-action provision is that all individuals who must receive notice are allowed to litigate, if at all, only through the procedure described in § 19.356(4), but no other individuals are limited by § 19.356(1) in their access to judicial review.

¶ 36. One flaw in this argument is that it is entirely inconsistent with the following statutory terms, which we are not free to amend: *"No person* is entitled to judicial review," *"[e]xcept* as authorized in this section or as otherwise provided by statute." Teague points to no textual clue in WIS. STAT. § 19.356, in the public records law generally, or in any other statute, that suggests that the legislature did not intend for this to mean that all persons are prohibited from seeking review of a decision to release public records under the public records law by a judge except in the two defined circumstances: (1) § 19.356 authorizes judicial review, or (2) a statute other than § 19.356 provides for judicial review. This includes Teague's failure to point to any applicable definition of "judicial review" that is inconsistent with what would seem to be the obvious meaning: review by a judge, including a state circuit court judge.

569

¶ 37. Moreover, Teague's argument is undermined by the consistent use of the phrase "judicial review" by our supreme court and this court to refer to the type of review that Teague seeks here. *See, e.g., Milwaukee Teachers' Educ. Ass'n*, 227 Wis. 2d at 791; *Woznicki*, 202 Wis. 2d at 183, 199; *Kraemer Bros., Inc. v. Dane Cty.*, 229 Wis. 2d 86, 94, 599 N.W.2d 75 (Ct. App. 1999). There appears to be no difference between the concept referred to as "judicial review" in these opinions and the type of review that Teague seeks, and "[w]e presume that the legislature enacts statutes with knowledge of the law." *See State v. Stanley*, 2012 WI App 42, ¶ 40, 340 Wis. 2d 663, 814 N.W.2d 867.

¶ 38. Teague points to *Zellner v. Cedarburg School District*, 2007 WI 53, 300 Wis. 2d 290, 731 N.W.2d 240, as evidence that the "public interest in protecting private reputations continued to be recognized after 2003 Wisconsin Act 47 became law." *Zellner* involved the request of a public school teacher for an injunction prohibiting his employer school district from releasing records allegedly reflecting improper conduct related to his termination from employment. *Id.*, ¶¶ 1, 7–13. We reject Teague's argument because the court in *Zellner* did not address WIS. STAT. § 19.356(1). We reject it for the additional reason that, putting aside irrelevant topics in *Zellner*, the supreme court's opinion appears to represent a straightforward application of § 19.356 to the teacher's request for the injunction as involving disciplinary-related employment records under § 19.356(2)(a)1. Teague emphasizes a passage in *Zellner* stating that "the public interest in the protection of the reputation and privacy of citizens may be a factor that favors nonrelease"

under *Woznicki. See Zellner*, 300 Wis. 2d 290, ¶ 50. However, addressing this topic is consistent with Wis. Stat. § 19.356(6):

> The court, in an action commenced under sub. (4), may restrain the authority from providing access to the requested record. The court shall apply substantive common law principles construing the right to inspect, copy, or receive copies of records in making its decision.

¶ 39. Separately, Teague bases two arguments on apparent misreadings of public records law provisions. First, Teague contends that, in enacting Wis. Stat. § 19.356, the legislature could not have "intended to eliminate courts' authority to apply the *de novo* common law balancing test in all [public] records cases other than those involving public employees." However, a premise of this argument is incorrect, in that the three exceptions in § 19.356(2) are not limited to cases involving records relating to public employees. *See, e.g.,* § 19.356(2)(a)2. (paragraph (a) applies to records "obtained by the authority through a subpoena or search warrant.").

¶ 40. Second, Teague contends that our interpretation of Wis. Stat. § 19.356 necessarily conflicts with Wis. Stat. § 19.36(10)-(12). We disagree. The provisions in § 19.36(10)-(12) limit in various ways the release of records disclosing personally identifying information, such as home addresses and social security numbers. Teague argues that the necessary conflict is that, under our interpretation of § 19.356, "no employee of an authority can [bring an action] to prevent disclosure of" the personally identifying information. However, our interpretation of § 19.356 would not render § 19.36(10)-(12) a dead letter. Many records that are

571

subject to judicial review under the procedure described in § 19.356(4), because they are identified in § 19.356(2)(a), might contain personally identifying information. Teague himself cites one, directly undermining his own argument: the records prepared by non-authority employers described in § 19.356(2)(a)3. could contain personally identifying information. Moreover, our discussion is restricted to the limitations created in § 19.356 to judicial review of claims made under the public records law, not to other routes that individuals might use to seek relief when they believe that their privacy or reputational rights have been violated.

¶ 41. Teague argues that WIS. STAT. § 19.356 does not apply to his public records claim because the relief he seeks is not only for a court order preventing DOJ from releasing records, but also for an order allowing him access to records, namely, "to Teague's database 'record' of innocence." However, as the state officials point out, Teague's public records law claim was not filed as a mandamus action requiring release of any record under WIS. STAT. § 19.37(1). In his public records claim, Teague sought an order barring DOJ from providing requesters with records, and we have explained why his public records claim is precluded by the right-of-action provision.

¶ 42. In sum, we conclude that WIS. STAT. § 19.356(1) unambiguously precludes judicial review of Teague's public records law claim, and we reject Teague's arguments to the contrary. We express no views on how we might resolve the merits of Teague's public records law argument if § 19.356(1) did not prevent judicial review under the public records law.

## II. Wis. Stat. § 19.70: CORRECTION OR SUPPLEMENTATION

¶ 43. Relying on Wis. Stat. § 19.70, Teague asked the circuit court to order that "a criminal history record request about Mr. Teague should produce a report that says[,] 'No criminal history found.' " At oral argument before this court, we understood Teague to contend that the state officials should be required, under authority of § 19.70, to "correct" or supplement the database in such a way that when DOJ responds to name-based search requests using Teague's identifiers the released reports reflect the contents of the innocence letter issued to Teague.[9] However, we conclude that Teague does not trigger the potential for relief under § 19.70, because he does not challenge "the accuracy" of any record maintained by DOJ that is susceptible to "correct[ion]." Instead, Teague seeks relief to avoid the potential for misinterpretations of records that are accurate but ambiguous, records that may be better understood when considered together with separate records.

¶ 44. There is no dispute about pertinent facts, and the question we address involves statutory interpretation, which we consider on a de novo basis. *See Tammi*, 320 Wis. 2d 45, ¶ 25.

---

[9] The concurring opinion of Judge Higginbotham has merit. Even at oral argument, after full briefing and prompting by the court, it was difficult to pin down precisely what form of relief Teague seeks under the authority of Wis. Stat. § 19.70. However, this discussion section assumes without deciding that Teague presented the circuit court and this court with a developed argument for relief under § 19.70.

¶ 45. Wɪs. Sᴛᴀᴛ. § 19.70 authorizes a person who is identified in a record "maintained by an authority" to "challenge the accuracy" of the record, by asking the authority to "correct the information."[10] *See* § 19.70(1). "After receiving the notice, the authority shall" either "correct" the inaccurate information, or else "deny the challenge." Section 19.70(1)(a), (b). In the event that the authority denies the request to correct the allegedly inaccurate information, the authority must allow the individual "to file a concise statement setting forth the reasons for the individual's disagreement with the disputed portion of the record." Section 19.70(1)(b).

¶ 46. We observe that Wɪs. Sᴛᴀᴛ. § 19.70(1)(b) functions as a tie-breaker in disputes about the accuracy of an identified record between an individual referred to in the record and the authority holding it, requiring the authority to allow the individual to effectively supplement the allegedly inaccurate record if the authority denies the request to correct it.

---

[10] What is now Wɪs. Sᴛᴀᴛ. § 19.70 (but Wɪs. Sᴛᴀᴛ. § 19.365 at the time the complaint was filed) is entitled "**Rights of data subject to challenge; authority corrections**," provides in pertinent part:

(1) ... [A]n individual or person authorized by the individual may challenge the accuracy of a record containing personally identifiable information pertaining to the individual that is maintained by an authority if ... the individual notifies the authority, in writing, of the challenge. After receiving the notice, the authority shall do one of the following:

(a) Concur with the challenge and correct the information.

(b) Deny the challenge, notify the individual or person authorized by the individual of the denial and allow the individual or person authorized by the individual to file a concise statement setting forth the reasons for the individual's disagreement with the disputed portion of the record. A state authority that denies a challenge shall also notify the individual or person authorized by the individual of the reasons for the denial.

¶ 47. The state officials offer us no reason to conclude that DOJ is not an authority that may be ordered to comply with the terms of Wis. Stat. § 19.70 under appropriate circumstances, or to conclude that § 19.70 could not be applicable to inaccurate records in the database. However, Teague acknowledges that the database is not inaccurate in listing Teague's name as an alias for the person whose fingerprints are linked to the record listing ATP as the master name. The essence of Teague's claim is not that the alias information is inaccurate, but that it is capable of being misunderstood unless it is also presented with the substance of the innocence letter. We now explain in more detail why we conclude that § 19.70 could not provide relief under these circumstances.

¶ 48. A brief word of clarification may be in order. It is difficult to discern whether Teague requests an order correcting or supplementing the contents of the database or instead an order for prospective, injunctive relief requiring DOJ to correct or supplement each new report that may be generated in response to any future name-based search request using his identifiers. However, at bottom we see no difference between these two concepts that could assist Teague in any argument that he makes. The requests at issue are made using a form requesting a "Search for a Record on" the Teague identifiers in the database, and the responding report accurately reflects references to Teague identifiers in the database.[11] Teague complains about the contents of the pertinent portion of the database, including when

---

[11] Based on explanations offered at oral argument, it appears that DOJ has in the past released criminal history reports that we would likely view as inaccurate. Under a prior DOJ practice, the phrase "Convicted Felon" appeared near

it appears in the report that DOJ compiles and releases in response to a request for criminal history referring to Teague. Therefore, for the sake of simplicity, we refer to the relief that Teague seeks as a request to correct or supplement the database.[12]

¶ 49. With that clarification, we address the pertinent portion of the database. Teague does not contend that it is not factually accurate to say that Teague's name has been used as an alias by ATP, nor

Teague's name. However, we were assured that this is no longer the DOJ practice, and Teague does not argue to the contrary.

[12] While our focus is on the database, we agree with the state officials that it is all the more difficult to construe as inaccurate a challenged report compiled from the database in light of the extensive prefatory warnings and explanations in the report, which include but are not limited to the following:

> A criminal history search based only on a name, date of birth, and other identifying data that is not unique to a particular person . . . may result in:
>
> . . . .
>
> . . . Identification of a criminal history record belonging to a person whose identifying information is similar in some way to the identifying data that was submitted . . ., but is not the same person whose identifying data was submitted . . . .
>
> . . . .
>
> *Do not just assume that the criminal history record below pertains to the person in whom you are interested.*
>
> . . . .
>
> *It is not uncommon for criminal offenders to use alias or fraudulent names and false dates of birth . . . .*

(Emphasis in original) In addition, there is a "NOTICE TO EMPLOYERS" that raises cautions about the lawful and appropriate uses of criminal history in hiring practices, which refers to accuracy concerns.

576

that it is inaccurate to say that ATP has the criminal history reflected in the database. Instead, Teague argues that a requester without pertinent background knowledge of ATP or Teague who receives the ATP criminal history information could suspect that Teague might have the convictions that are in fact ATP's. We agree that the database information might be read this way. However, it could also be understood, accurately, to reflect that Teague's name is only an alias that ATP has used. In other words, the database information is ambiguous and open to interpretation.[13]

¶ 50. Teague's counsel conceded as much at oral argument, saying that the database "leaves" a reader "with the ambiguity as to which one used the alias," ATP or Teague.

¶ 51. Teague does not make clear whether he seeks relief under Wis. Stat. § 19.70(1)(a) (correction) as opposed to § 19.70(1)(b) (supplementation). However, we conclude that he is not entitled to either, because neither part of § 19.70 is a vehicle for directing authorities how they must keep records. Teague's request in effect seeks an order requiring DOJ to correct or supplement its database so that it reflects the following concepts, with the phrase in italics representing the correction or supplementation: "The

---

[13] Teague may intend to argue that an inaccuracy requiring correction is that the database reflects two alternative birthdates associated with ATP and Dennis Antonio Teague, one of which is not close to Teague's birthdate and the other of which is six days apart from it. However, the database on its face strongly suggests that the two birthdates have been used in association with the name ATP, not necessarily in association with the "alias" of Dennis Antonio Teague. The multiple birthdates associated with the ATP name raise questions that might be interpreted in a variety of ways, but there is no inaccuracy.

Teague identifiers have been used as an alias by convicted person ATP, *but Teague is a different person from ATP and as of 2009 Teague had no criminal history.*" This is not a correction, but an explanation that contains additional information, and § 19.70 is not a legal mechanism for requiring authorities to make accurate records more complete.

¶ 52. We acknowledge that the distinction we interpret the legislature to have made in WIS. STAT. § 19.70—the distinction between a record that contains a correctable error and one that is merely susceptible to potential misinterpretation or that could be described as incomplete—necessarily will require judgment calls from case to case. As a matter of logic, the concept of accuracy would appear to involve a continuum that begins with a demonstrable error of fact and runs to information that may not be demonstrably false but that on its face is likely to mislead. At a minimum, however, accuracy involves error, deviation from truth. "[F]ree from error or mistake esp[ecially] as the result of care . . .[;] in exact conformity to truth or to some standard." *Accurate,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993).

¶ 53. With that understanding, we conclude that WIS. STAT. § 19.70 reflects a legislative determination to provide relief for only those circumstances that involve the identification of factual errors of a type not identified in the database. The database accurately reflects that ATP is a felon who has used Teague's name as an alias, does not state that Teague is a convicted felon, and does not identify a photograph of another person as being Teague. It seems highly unlikely that the legislature intended to set virtually no limit for the types of corrections and supplementations that persons identified in public records could compel authori-

578

ties to make under the purported authority of § 19.70. Drawing the line at challenges to "accuracy," when a "correct" piece of information can be substituted, is an obvious way for the legislature to address potential problems arising from incorrect information in public records, without at the same time inviting individuals referred to in records to supplement them with any variety of additional pieces that might complete various puzzles.

¶ 54. For these reasons, we reject Teague's arguments that his Wis. Stat. § 19.70 claim is viable.

### III. EQUAL PROTECTION

¶ 55. Teague alleges that the state officials violate the equal protection clause by treating the following two groups differently: (1) persons without a criminal record who, unlike Teague, have *not* had their names used as aliases by persons who have criminal histories; and (2) persons without a criminal record who, like Teague, *have* been the victims of identity theft by persons with criminal histories. We first explain why we reject Teague's argument that this case involves an administrative policy that DOJ should have properly promulgated and therefore DOJ is entitled to "no deference" from this court. Then we explain why we reject Teague's argument based on the correct legal standard.

¶ 56. The federal and state constitutions "guarantee individuals equal protection under the law. U.S. Const. amend. XIV, § 1; Wis. Const. art. I, § 1. Equal protection under our state constitution is generally interpreted in the same way as the equal protection

579

clause found in the federal constitution." *Milwaukee Cty. v. Mary F.-R.*, 2013 WI 92, ¶ 10, 351 Wis. 2d 273, 839 N.W.2d 581.

¶ 57. Citing cases involving administrative decisions that have been overturned at least in part because administrative agencies had not properly promulgated pertinent rules, Teague argues that we should conclude that the challenged DOJ practices here are "presumptively **invalid**." We reject this argument because Teague did not present it to the circuit court. When the state officials argue forfeiture in their response brief, Teague responds by asserting that he did raise the issue, citing to a footnote in his brief to the circuit court filed in support of his motion for summary judgment. However, the footnote does not even indirectly suggest the argument that Teague now makes on appeal. Moreover, Teague does not attempt to persuade us that we should not apply the ordinary rule of forfeiture. *See State v. Ndina*, 2009 WI 21, ¶ 30, 315 Wis. 2d 653, 761 N.W.2d 612. We apply the ordinary rule here, in part because we see no potential merit in the underlying argument.

¶ 58. Teague's remaining equal protection argument is that DOJ is engaged in "an irrational or arbitrary classification." *See Aicher v. Wisconsin Patients Comp. Fund*, 2000 WI 98, ¶ 57, 237 Wis. 2d 99, 613 N.W.2d 849. As the court explained in *Aicher* in addressing whether statutes offend the right to equal protection of the laws:

> Under the rational basis test, a statute is unconstitutional if the legislature applied an irrational or arbitrary classification when it enacted the provision.

580

The task of drawing lines between different classifications is a legislative one in which perfection "is neither possible nor necessary." It is not our role to determine the wisdom or rationale underpinning a particular legislative pronouncement. This court therefore must sustain a statute unless we find that "it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest." Recognizing that classifications often are imperfect and can produce inequities, our goal is to determine whether a classification scheme rationally advances a legislative objective. In so doing, we are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative determination.

*Id.*, ¶ 57 (citations omitted); *see also id.*, ¶ 58 (five-factor test applies: classification must be based on substantial distinctions; germane to the purpose of the law; not be based upon existing circumstances only; apply equally to each member; and "the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.").

¶ 59. The state officials argue that there is a mismatch between the rights guaranteed by the equal protection clause and the DOJ practices challenged here on the ground that they create an unconstitutional classification. However, we assume without deciding that Teague has properly framed an argument that the DOJ practices could be challenged as an unconstitutional classification. With that assumption, we now explain why we conclude that the DOJ practices bear at least a rational relationship to a legitimate government interest in providing accurate information that may assist requesters.

¶ 60. Teague argues that "there is no substantial distinction in the Teague cohort that makes them different from other innocent citizens." However, it is undisputed that ATP used Teague's name as an alias, and ATP may decide to do so again. As the state officials point out, at least sometimes a requester submitting a name-based search request might have obtained the submitted personal identification information from an individual who is pretending to be someone else (here, if ATP applies for a job using the name Teague), just as he or she has pretended to be that person in the past (ATP has told police in the past that his name is Teague). In that circumstance, the requester (a potential employer of ATP, at a time when ATP is using Teague's name) receives a DOJ report that might provide the requester with information that the requester has a legitimate interest in knowing: in our example, a photograph of ATP, ATP's criminal history, and the suggestion that ATP has used Teague's identifiers. The state officials point out that this is an example in which, "quickly and relatively easily," DOJ's approach produces a report that is "germane to the purpose: it is a useful first step in detecting a trick, or in discerning if someone has a relevant criminal record."

¶ 61. Teague's responses to the state officials' argument miss the target under the rational basis test because, instead of rebutting the argument directly, Teague points to imperfections and inequities in DOJ practices that might not exist under alternative approaches that DOJ could use. Teague points out that DOJ does not produce the ATP criminal history referring to Teague as an alias only when a requester explicitly asks for alias information. However, Teague fails to explain why we should conclude that alias

information cannot rationally be considered germane to legitimate purposes. Teague suggests that in order for the circuit court to dismiss Teague's equal protection claim, the state officials needed to prove that requesters are "being duped by tricksters using the same aliases and date of birth as they previously used during past police contacts." However, under the legal standard we have stated above, we are obligated to consider whether we can "construct a rationale" under which DOJ's practices meet a legitimate purpose. We do not consider it a stretch to imagine someone in ATP's position continuing to use alias identifiers that may have proved useful on at least one prior occasion.

¶ 62. For these reasons, and without addressing additional arguments on this topic advanced by either side, we reject Teague's arguments in support of his equal protection claim.

## IV. SUBSTANTIVE DUE PROCESS

¶ 63. Teague asserts in his principal brief on appeal that DOJ's practices violate Teague's "fundamental right . . . not to be intentionally associated by the government with a conviction record that is not" Teague's, and involve "so much uncertainty and reflect[] so little reasoned policy (as opposed to choices based on system design and individual preference) that [they are] arbitrary by definition." Teague gives the impression that he asks this court to extend substantive due process law in a significant way, yet he cites to no useful legal authority, much less does he develop a legal argument based on any authority. Teague briefly recites general legal standards in an introductory paragraph, but fails to cite a single case to support either prong of his apparently novel substan-

tive due process arguments. We decline to address these significant constitutional concepts as if they had been developed properly as legal arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (courts may not act as advocates; inadequately briefed arguments may be ignored).

## V. PROCEDURAL DUE PROCESS

¶ 64. Teague argues that he has presented evidence that the release of the DOJ report would damage his reputation, resulting in tangible harm to him, violating his right to procedural due process. We reject this argument because he fails to show that the circuit court clearly erred in finding facts, or in the alternative erred on a question of law, in determining that Teague did not show that he has been stigmatized in a manner that has altered or eliminated a right or status previously recognized under state law.

¶ 65. Broadly speaking, the right to procedural due process is "rooted in the Fourteenth Amendment to the United States Constitution, and Article I, Section 1 of the Wisconsin Constitution," and addresses "the question of fairness" in government action. *State v. Wood*, 2010 WI 17, ¶ 17 323 Wis. 2d 321, 780 N.W.2d 63. More specifically, as pertinent here:

> A person's reputation falls within the scope of property or liberty interests protected by procedural due process because when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her]," due process is essential. However a person's reputation is protected by procedural due process only when damage to the

584

reputation is accompanied by the alteration or elimination of a right or status previously recognized under state law.

*Stipetich v. Grosshans*, 2000 WI App 100, ¶ 24, 235 Wis. 2d 69, 612 N.W.2d 346 (citations omitted). Thus, Teague needs to demonstrate (1) that his reputation has been damaged, and (2) that this has resulted in tangible harm to him, such that a "right or status previously recognized under state law" that he previously possessed has been altered or eliminated.

¶ 66. On the first issue, involving damage to reputation, the state officials argue that Teague's contention in the circuit court that DOJ's practices have harmed his reputation rested on speculation alone, an argument that Teague contests on appeal. We put that dispute aside, and focus on the findings of the circuit court regarding the second required element of the claim, that there has been no tangible harm in the form of alteration or elimination of a right or status. The circuit court found that DOJ's responses "have not altered a legal status for [Teague] or prevented [Teague's] employment or deprived [him] of any other right or privilege. The responses are not an adjudication or statement of criminal guilt and are not by themselves, *per se,* an alteration of legal status."

¶ 67. Teague does not argue that the circuit court clearly erred in finding any fact. Instead, his only argument on this topic is that the court failed to apply a "growing line" of federal appellate and district court decisions that Teague contends "continues to develop," establishing that alteration or elimination of a right or status occurs in this context if the state action at issue "creates some burden to pursuing employment oppor-

tunities." However, the authority that Teague cites undermines his "some burden" argument.

¶ 68. Teague leads with *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), in which a state agency's reports of child abuse and neglect allegations against prospective employees, which state law required potential employers in the child care field to review, placed an "almost insuperable[ ] impediment on obtaining a position in the entire field of child care." *See id.* at 511. The court emphasized that it was addressing "unique circumstances," in that a liberty interest was implicated because an "indicated finding" of abuse or neglect effectively barred a child care worker from future employment in his or her chosen profession. *See id.* at 503, 511. Other cases cited by Teague reflect a similar standard. *See, e.g., Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) ("when a state actor casts doubt on an individual's 'good name, reputation, honor or integrity' in such a manner that it becomes '*virtually impossible* for the [individual] to find new employment in his chosen field,' the government has infringed upon that individual's liberty interest to pursue the occupation of his choice." (emphasis added) (quoted source omitted)).

¶ 69. In sum, assuming without deciding that Teague showed that DOJ's practices may create "some burden" for him in the employment context resulting from what might be called a false positive criminal history report, we reject the limited argument Teague makes on the tangible harm issue because it rests on authority that undermines his position. For this reason, we reject Teague's argument regarding the second required element of his procedural due process claim.

## CONCLUSION

¶ 70. For these reasons, we affirm the judgment of the circuit court dismissing each of the plaintiffs' claims.

*By the Court.*—Judgment affirmed.

∎

¶ 71. HIGGINBOTHAM, J. (*concurring*). I agree with the court's analyses and conclusions with respect to Teague's public records law claim and his constitutional claims alleging a denial of his equal protection rights and his rights to substantive and procedural due process. However, for the reasons that follow, I summarily reject Teague's claim brought under WIS. STAT. § 19.70 on grounds that differ from the majority's.

¶ 72. In Part II of the majority opinion, the court concludes, applying a plain language interpretation to WIS. STAT. § 19.70, that the relief Teague seeks under that statute is unavailable. I write separately because the only pertinent argument that Teague advances in support of his position that he is entitled to the relief that he seeks under § 19.70 is not fully developed. It is this court's practice to not address arguments that are not fully developed and I would follow that practice in this case. *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals may decline to address inadequately developed arguments). For that reason, I agree that Teague's arguments that he is entitled to declaratory and injunctive relief pursuant to § 19.70 should be rejected. However, I do not join in the majority's statutory analysis on this topic because it is unnecessary to the resolution of this issue.

¶ 73. Teague devotes a significant part of his brief on appeal challenging the bases that the circuit

court relied on in dismissing Teague's request for an order pursuant to Wis. Stat. § 19.70, requiring DOJ to either correct or supplement the criminal history reports it will release moving forward. At oral argument before this court, Teague continued his objection to the court's dismissal of his request for an order, but as the majority correctly states, it was difficult to determine precisely what form of relief Teague requests under § 19.70. In any event, assuming for the sake of argument that Teague correctly argues that the circuit court's decision to dismiss Teague's § 19.70 claim was in error, Teague does not explain why the court's errors entitle him to the relief that he seeks from DOJ.

¶ 74. And then, on the topic that the majority addresses that goes to the heart of this case, Teague does not present a fully developed argument. In a nutshell, Teague argues that because DOJ knows that Teague does not have a criminal record based on Teague's challenge, DOJ improperly "continues to associate [ATP's] felony record with Teague's personally identifying information." Teague then, in conclusory fashion and without any statutory analysis, asserts that Wis. Stat. § 19.70 requires DOJ to either stop disseminating ATP's criminal record in response to a request for information using Teague's name "or otherwise comply with the law." Teague does not tell us what other "law" obligates DOJ to provide the relief Teague seeks.

¶ 75. Teague's argument ends there, and the argument he makes in his reply brief on the topic of Wis. Stat. § 19.70 is even less developed.

¶ 76. I see no reason to develop Teague's arguments for him. I acknowledge that the majority's analysis on this topic is thorough and a product of

careful deliberation and thoughtfulness. However, it is readily apparent that Teague does not think that his WIS. STAT. § 19.70 claim deserves the attention that the majority gives; otherwise, Teague would have developed an argument applying a statutory analysis to undisputed facts in an effort to persuade this court why we should adopt his position on this topic. I see no reason to spend more time on the topic than Teague apparently believes it deserves.

¶ 77. Accordingly, I concur.

¶ 78. I am authorized to state that Judge Gary Sherman joins this concurrence.

¶ 79. SHERMAN, J. (*concurring*). I concur entirely in Judge Higginbotham's concurrence and join in it completely, including the first paragraph. Judge Higginbotham's concurrence, thus, is the majority opinion on the issue regarding WIS. STAT. § 19.70 in this case, and the majority opinion is the unanimous opinion of the court on all other issues. I write separately for an entirely different reason.

¶ 80. I find this case troubling. Whether or not the *amount* of harm or difficulty that the authority's method of responding to open records requests for criminal history in cases such as this rises to the constitutional level, it is undisputed that some citizens of this state are being caused *some* amount of harm by their government. While this court may not be in a position to provide these citizens with a remedy under this fact situation, two things are clear:

1. The government does not deny that it is in a position to remedy this situation with very little difficulty or expense; and

2. The government provides no governmental reason why it chooses not to do so.

¶ 81. It is my belief that the authority's response to criminal records requests in situations where there is an *innocence letter* on file is an incomplete response. The innocence letter is a record within the meaning of Wis. Stat. § 19.32(2).[1] It is directly relevant to an inquiry about the criminal record of the subject of the innocence letter. Yet, the innocence letter is not provided in response to such an inquiry. This is obviously an incomplete response to the inquiry.[2] It is not settled law whether an incomplete response is an inaccurate response under the open records law, but logic would suggest that it is.[3]

---

[1] Wisconsin Stat. § 19.32(2), in relevant part, reads: " 'Record' means any material on which written, drawn, printed, spoken, visual, or electromagnetic information or electronically generated or stored data is recorded or preserved . . . ."

[2] The State does not argue that the innocence letter is part of a "[r]ecords series" as that term is defined in Wis. Stat. § 19.62(7), which is an exception to the open records law because it is not retrievable by searching by use of the individual's name, address or other identifier. *See* Wis. Stat. § 19.35(1)(am)3.

[3] While the terms "inaccurate" and "incomplete" have slightly different dictionary definitions, they are obviously related. A Google search for the definition of "incomplete" yields the following definition: "not having all the necessary or appropriate parts," as in " 'the records are patchy and incomplete.' " Its list of synonyms includes "deficient, insufficient, imperfect, defective." *See* https://www.google.com/?gws_rd=ssl#q=define+incomplete (last visited February 8, 2016). While a Google search for the definition of "inaccurate" simply yields "not accurate," the synonyms include not only words like "inexact, imprecise, incorrect" but also "imperfect" and "defective," which are also on the list of synonyms for "incomplete." *See* https://www.google.com/?gws_rd=ssl#q=define+inaccurate (last visited February 8, 2016).

¶ 82. The State said at oral argument that there were relatively few innocence letters and that they are kept in a filing cabinet in alphabetical order by name. Because they are not part of the criminal history database, and because the number of inquiries far exceeds those in which the innocence letter would be relevant, the State seems to argue that it would be inconvenient to search to see if there is an innocence letter in response to each inquiry.

¶ 83. Because the number of innocence letters is small, the State's argument is difficult to reconcile with good faith. There are many ways in which an inexpensive routine method of checking for innocence letters could be incorporated into the procedure. If it is too much trouble to ask the clerical employee who checks the database for each inquiry to walk over to the cabinet, or too expensive to alter the database, there are several alternatives that would not involve adding the innocence letter to the database.

¶ 84. For example, a simple list could be maintained of the names of individuals who have been issued innocence letters, either in hard copy on the desk of the employee involved, or on the computer in a file that is easy to check. Because it would be easier to update, a table or spreadsheet which automatically alphabetizes new entries could be employed as a second option. These suggestions are certainly not exhaustive. Or of significant cost.

¶ 85. What is most troubling to me about this case is that it is here at all. Just because one can do something does not mean that one ought to. Irrespective of this court's ability to resolve the problem, why does the authority not resolve the problem itself? The authority has suggested no governmental reason not to do so. A citizen of this state is being harmed by a

practice of the government that has no apparent governmental purpose and that would be easy and inexpensive to correct, yet the only response of the authority is that it will continue to do so because there is no law that compels it to do otherwise. In essence, *we are doing this to you because we can.* That is the response of a bully and not an appropriate response of the government of a democracy.

¶ 86. Accordingly, I concur.